THE CAMDEN SAFE DEPOSIT AND TRUST COMPANY

*v.*

CITIZENS' ICE AND COLD STORAGE COMPANY et al.

[Decided July 5th, 1905.]

1. Where a contract with a corporation has been completed by the other party, and the corporation has had the benefit of it, the plea of *ultra vires* is not admissible to estop the party who had performed from the enforcement of the agreement unless the transaction is contrary to public policy, forbidden by law, or immoral.

2. Where bonds of a corporation were not, owing to the character of the corporation's business, readily marketable, and unavailing efforts had been made to sell them to other parties than the creditor whose debt they were issued to secure, after which such creditor bought them at a price which was not unconscionable, though less than their face value, a director of the corporation was not, in the absence of fraud or unjust advantage, precluded from purchasing the creditor's interest in the bonds at its market value and recovering the face value of the bonds.

*Mr. George J. Bergen, Mr. Peter V. Voorhees* and *Mr. John Dickie, Jr.,* for the complainant.

*Mr. Norman Grey* and *Mr. Wilfred B. Wolcott,* for the defendants.

BERGEN, V. C.

The object of this suit is the foreclosure of a mortgage given by the defendant the Citizens' Ice and Cold Storage Company to the complainant, as trustee, to secure the payment of forty bonds of $1,000 each, payable fifteen years from June 1st, 1897, the date of the mortgage, with interest semi-annually. The mortgage contains a covenant that if interest be in default for thirty days, an option to declare the principal sum due is vested in the mortgagee, and it appears that this condition is present and justifies the complainant in the exercise of the option, and under it to ask the court to decree the whole amount to be due. The owner of all of the bonds is James Brown. There are numerous defendants, holders of subsequent liens and encumbrances on the mortgaged premises, but since this cause was instituted the mortgaged premises have been sold by the receiver of the Citizens' Ice and Cold Storage Company, an insolvent corporation, free and discharged of all the encumbrances, except the complainant's mortgage to Lewis Audenried, who holds the same in trust for the Pennsylvania Iron Works Company, which company held a mortgage for $28,000 on the premises when this suit was instituted, it being one of the encumbrances affected by the receiver's sale. The real contest is between Brown, the holder of the bonds, and the Pennsylvania Iron Works Company, for whom the title is held in trust. The mortgage is assailed because, as alleged, it was executed and delivered for purposes outside of the objects stated in the charter, by which authority to mortgage the corporation property was conferred. The objects for which the company was formed, as stated in its articles of association, were the purchase, manufacture and sale of ice, distilled water, hay, straw, feed, grain, coal, kindling wood and

all other articles of fuel, and the maintenance of a plant for those purposes,

"including the acquiring, by purchase, lease or otherwise, of all necessary lands and buildings thereon, equipments thereof and machinery, and other articles necessary or convenient for use in connection with the carrying on of the business of manufacturing and selling as aforesaid; and in general the engaging in any and all other business whatever necessary or convenient in connection with the business of said company, and the doing of any other act or acts, thing or things, incidentally to grow out of or connected with said business or any part or parts thereof; to issue bonds secured by mortgage or mortgages upon the property and franchises of said corporation, and to sell the same for the purpose of raising money with which to erect machinery and otherwise to improve said lands."

The defence set up is that the proceeds of the bonds secured by the mortgage under foreclosure were used by the officers of the company in part for the payment of debts contracted for other purposes than those last stated, and therefore the mortgage, by way of security, is *ultra vires,* and cannot stand as a preference, and that this is especially so because Brown was, at the time the mortgage was made, one of the directors of the company. The debt represented by these bonds had its foundation in the advancement of moneys, by one Charles A. Furbush, to the company amounting to something over $41,000, a large proportion of which, certainly more than $35,000, was used in providing buildings and otherwise improving the real estate of the company. As this debt had to be satisfied, the company, in due form, executed its mortgage in 1894 to secure the payment of its bonds to the extent of $35,000, and after a reasonably fair effort to sell and dispose of the bonds to other parties, they were sold to Mr. Furbush for $26,250, and the balance due to him was satisfied by the issue of $15,000 of the preferred stock of the company. On the 1st of December, 1898, a new mortgage was given to the same trustee, being the mortgage now in controversy, to secure the payment of $40,000 represented by forty bonds of $1,000 each. These bonds were delivered to the trust company, the trustee, in return for the bonds originally issued, amounting to $35,000, and the cancellation of two prior mort-

gages on the same premises of $2,500 each. The dealings of Mr.
Furbush with this company were conducted in the name of
"Charles A. Furbush joint account," of which account Mr.
Brown, the present holder of the bonds, was a half owner, and
to whom Mr. Furbush subsequently sold his interest in the
bonds. Some of the buildings were destroyed by fire, resulting
in the company's receiving from insurance something over
$11,000, of which $8,000 was taken to redeem eight of these
bonds, leaving yet outstanding $32,000 of bonds at par. It was
shown that over $100,000 was expended in the purchase of the
property, the erection of buildings thereon and the improvement
of the plant, and while it undoubtedly appears that some of the
money advanced by Furbush was used to pay wages and carry on
the operations of the business, the amount actually used in pre-
paring the plant was greater than the amount for which the
mortgage was given, and the application by the company of
small portions of the money advanced by Furbush towards the
operation or conduct of the business is not sufficient to justify
us in finding that the amount represented by the mortgage was
not expended for the plant and the improvement. It is not
claimed that the moneys this mortgage was given to secure were
not honestly advanced for the benefit of the company, and it
abundantly appears that the company received the money and
applied it in liquidation of its debts. The purpose for which
the mortgage was made was to provide funds to liquidate the
debt due for moneys advanced to build the plant by Furbush.
For want of another purchaser, he was induced to take the bonds
and stock in satisfaction of his claim and fund the debt. The
great weight of authority favors the rule that where the contract
has been completed, and the corporation has had the benefit of
it, the plea of *ultra vires* is not admissible to estop the party who
has performed from the enforcement of the agreement, unless
the transaction is contrary to public policy, forbidden by law, or
immoral. *Camden and Atlantic Railroad Co.* v. *Mays Landing,
&c., Railroad Co., 48 N. J. Law (19 Vr.) 530.*

In *Bradley* v. *Ballard, 55 Ill. 413,* notes were given by a cor-
poration for money borrowed to enable it to prosecute a business

which the lender knew it had no right to undertake, but the court enforced the doctrine of estoppel, saying "that it would be pressing the doctrine of *ultra vires* to an extent that can never be tolerated, even though the lender knew that the corporation was transacting a business beyond its corporate powers, provided the business itself was free from any intrinsic immorality or illegality," to permit such a plea and to aid a corporation in the avoidance of "the simplest and commonest sense of honesty." The violation by a corporation of its chartered authority subjects it to a forfeiture of its corporate existence at the hands of the state, and any mischief which might arise should a corporation undertake to exercise powers not granted, to the injury of the public, could be corrected in proceedings instituted by or on behalf of the state.

I have no doubt that, so far as the bonds are concerned, they are held by Brown free from any defence rested upon the doctrine *ultra vires*.

The right to hold the mortgage as a security for the debt is governed by the rule that the creditor seeking the aid of the mortgage as a security must establish it as an encumbrance which the corporation could lawfully make. But in this case, even if we consider the clause in the charter as restrictive, as urged by the defendant, the mortgage would be, as to innocent parties, a valid security, because the power to make the mortgage for a special purpose is expressly granted, and such purchaser of its bonds could not control the application of the proceeds.

The defendant, however, insists that, as Brown is a director and a silent partner of Furbush, he is not in a position to assert his innocence, and took the bonds with knowledge of the alleged infirmity. The testimony shows that from the outset of the business Furbush advanced large sums of money for the company, most of which was used in accordance with the terms of the charter. To illustrate, on August 20th, 1894, he advanced $2,500, of which $2,406.07 went into the plant; in September, 1894, $10,000, of which $9,164 was so applied, and so through all the items the great bulk of the money was properly applied, the total of such applications being $35,557.35, from which it

will appear that at least more than the required amount was expended as required by the charter, if we hold its terms as restrictive, as defendant insists, and the mortgage given for a sum within the amount of the expenditures on plant account.

It is also insisted that as Furbush purchased the bonds for less than their face value, Brown, being a director, ought not now to recover more than the amount paid by Furbush, but there is nothing in the case to justify such a result, for the bonds were not, owing to the character of the business the company was engaged in, readily marketable. Efforts had been made to sell to other parties, and after failure to find another purchaser, Furbush bought them at a price which cannot be said to have been unconscionable in view of all the circumstances, and unless fraud be shown or some unjust advantage taken of a situation, there is no reason why the officers of a company may not purchase its bonds at their market value.

In my judgment the defence has not been sustained, and the complainant is entitled to a decree.