ALABAMA CONSOL. COAL & IRON CO. et al. v. BALTIMORE TRUST CO.

(District Court, D. Maryland.    June 28, 1912.)

1. CORPORATIONS (§ 68*)—PREFERRED STOCK—CONVERSION INTO BONDS—STAT-
UTES.

P. L. (N. J.) 1902, p. 217, prescribing the form in which New Jersey corporations may convert preferred stock into bonds, was applicable to all subsequent conversions of that character.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 181, 183, 449; Dec. Dig. § 68.*]

2. CORPORATIONS (§ 152*)—DIVIDENDS—PAYMENT—BORROWING MONEY.

Evidence that some of the money actually paid to stockholders by a corporation as dividends was borrowed for that purpose did not show that the dividend declared and paid had not been earned.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 564–567; Dec. Dig. § 152.*]

3. CORPORATIONS (§ 68*)—PREFERRED STOCK—EXCHANGE FOR BONDS—MEET-
INGS OF STOCKHOLDERS.

Where at certain meetings of stockholders of a corporation all that was done with reference to a proposed conversion of preferred stock into bonds was to vote that some of the stock which the stockholders orig-inally intended to redeem should not be converted, and all of the ex-changes which were ever made were consummated some months before such meetings were held, it could not be said that the exchange was ille-gal because authorized at such meetings, and that at that time the corpo-ration's floating debt was such that the exchange could not be legally made.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 181–183, 449; Dec. Dig. § 68.*]

4. CORPORATIONS (§ 68*)—PREFERRED STOCK—CHANGE INTO BONDS.

Where the affidavit of the treasurer and auditor of a corporation, stat-ed that the time a vote was taken authorizing the conversion of certain preferred stock into bonds, the company's floating indebtedness exceeded 10 per cent. of its outstanding capital stock, so that pursuant to P. L. (N. J.) 1902, p. 217, the conversion could not be authorized, but it ap-peared that if the auditor had not included an item for taxes and inter-est on bonds, not shown to be due, and for certain proportionate salaries not shown to have been earned, the floating debt would not have exceed-ed the statutory amount, such affidavit was insufficient to show that such was the fact.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 181–183, 449; Dec. Dig. § 68.*]

5. CORPORATIONS (§ 68*)—PREFERRED STOCK—CONVERSION INTO BONDS—TIME.

Where a corporation voted to convert certain preferred stock into bonds, as authorized by P. L. (N. J.) 1902, p. 217, the statute not having

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

prescribed any particular period within which such conversion should be .accomplished after having been .voted, the fact that it did not consummate the transaction until 17 or 18 months after the vote did not invalidate it.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 181–183, 449; Dec. Dig. § 68.*]

**6.** CORPORATIONS (§ 68*) — PREFERRED STOCK — CONVERSION INTO BONDS — FLOATING INDEBTEDNESS—REDUCTION.

P. L. (N. J.) 1902, p. 217, authorizes corporations to convert preferred stock into bonds at a time when the floating indebtedness does not exceed 10 per cent. of such stock. *Held* that, where a corporation had cash in its treasury sufficient to reduce its floating indebtedness to an amount less than such 10 per cent. limit at the time such conversion was actually made, the transaction was not invalid because the indebtedness at that time was slightly in excess of the legal limit; it having been within the limit. when the conversion was voted.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ .181–183, 449; Dec. Dig. § 68.*]

**7.** CORPORATIONS (§ 68*) — PREFERRED STOCK — CONVERSION INTO BONDS — RIGHTS OF STOCKHOLDERS.

A preferred stockholder of a corporation cannot be compelled to exchange his stock holdings for bonds in pursuance of a corporate resolution under authority conferred by N. J. Pub. Laws 1902, p. 217.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 181–183, 449; Dec. Dig. § 68.*]

**8.** CORPORATIONS (§ 68*)—PREFERRED STOCK—EXCHANGE FOR BONDS—ABROGATION OF PLAN—DELAY.

Where the stockholders of a corporation authorized the conversion of preferred stock into bonds as provided by P. L. (N. J.) 1902, p. 217, the action of the directors in thereafter voting to postpone such conversion indefinitely and to return the shares of preferred stock deposited under the agreement because of a stringency in the money market did not necessarily abrogate the plan, nor deprive them of the authority to subsequently proceed with the conversion at a more favorable opportunity.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 181–183, 449; Dec. Dig. § 68.*]

**9.** CORPORATIONS (§ 68*) — PREFERRED STOCK — CONVERSION INTO BONDS — CHANGE OF PLAN.

Where a corporation voted to convert its preferred stock into bonds, and thereafter the directors changed the plan so as to make a partial conversion only, such change was not objectionable except at the instance of a stockholder denied his right to exchange.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 181–183, 449; Dec. Dig. § 68.*]

**10.** CORPORATIONS (§ 471*) — PREFERRED STOCK — CONVERSION INTO BONDS — STATUTORY CONDITIONS—COMPLIANCE—ESTOPPEL.

Where a corporation converted certain of its preferred stock into bonds without filing a certificate that the corporation's indebtedness did not exceed 10 per cent. of its preferred stock as required by P. L. (N. J.) 1902, p. 217, such bonds so issued having been treated as valid by the corporation for more than seven years, and having been bought, sold, exchanged, and pledged, without their validity being in any wise questioned, the corporation was estopped to deny that they were valid because of a failure to file such certificate.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1833–1836, 1838, 1840; Dec. Dig. § 471.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

11. CORPORATIONS (§ 68*)—PREFERRED STOCK—EXCHANGE FOR BONDS—ULTRA VIRES.

An exchange of corporate preferred stock for bonds, having been authorized by P. L. (N. J.) 1902, p. 217, such conversion could not be held contrary to public policy or immoral.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 181–183, 449; Dec. Dig. § 68.*]

12. CORPORATIONS (§ 487*)—CONTRACTS—INVALIDITY—ULTRA VIRES.

Where a contract or transaction by a corporation is ultra vires in the sense that the corporation has no power so to act at all, the courts of the United States will not enforce the invalid transaction nor can any defense be predicated thereon, but, if there is nothing essentially immoral therein, the court will strive to do justice between the parties so far as it can be done, without in any wise relying on the illegal act.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1893–1898; Dec. Dig. § 487.*]

13. CORPORATIONS (§ 385*)—ULTRA VIRES ACTS—EXECUTED TRANSACTION.

Where an ultra vires transaction has been consummated by a corporation, so that the usurpation of power is at an end and each party has received from the other what he bargained for, the courts will leave the parties where it found them.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1545–1547; Dec. Dig. § 385.*]

14. CORPORATIONS (§ 388*)—ULTRA VIRES ACT—ESTOPPEL.

Where a transaction accomplished by a corporation was ultra vires only in the sense that it was not performed in a proper way, power to do it in a prescribed way having been expressly conferred, the corporation as against third persons would be estopped to deny that the method prescribed was pursued.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1556–1567; Dec. Dig. § 388.*]

15. COURTS (§ 366*)—FEDERAL COURTS—STATE LAWS AS RULES OF DECISION.

Since the only reason for holding illegal or ultra vires contracts of state corporations made and to be performed within the state of their incorporation is that to give them validity would be contrary to the policy of the state, what that policy is is for the determination of the state courts.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 954–957, 960–968; Dec. Dig. § 366.*

State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

16. INJUNCTION (§ 108*)—CONDITIONS PRECEDENT—TENDER.

A corporation having issued certain second-mortgage bonds in exchange for preferred stock without having filed the requisite certificate with the Secretary of State, years after the exchange sought to borrow $330,000 from defendant trust company, having every means of knowing that the certificate had not been filed, and also that defendant held a very large amount of the second-mortgage bonds, obtained the money, and pledged as collateral for the payment thereof a million and a quarter of its third-mortgage bonds, the validity of which was not denied. *Held*, that the corporation on making default in the payment of the loan was not entitled to an injunction restraining a sale of the collateral on the ground that the second-mortgage bonds were invalid, without offering to pay the amount of the debt.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 184–186; Dec. Dig. § 108.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Suit by the Alabama Consolidated Coal & Iron Company and another against the Baltimore Trust Company. On motion for preliminary injunction. Denied.

Robert H. McCarter, of Newark, N. J., and George Dobbin Penniman and H. R. Preston, both of Baltimore, Md., for complainants.

Gans & Haman, W. Calvin Chesnut, and Edgar H. Gans, all of Baltimore, Md., for defendant.

ROSE, District Judge. The Alabama Consolidated Coal & Iron Company is a complainant. It is a New Jersey corporation. It will be called the "Coal Company." The other complainant is Joseph H. Hoadley. He is a citizen of New York. The bill alleges that he is a stockholder in the Coal Company. At the hearing it was admitted that he was not. The Baltimore Trust Company is the respondent. It is a Maryland corporation. It has succeeded the International Trust Company. The latter was also incorporated under the laws of Maryland. It is not material to distinguish between the two trust companies. Each of them will be referred to as the "Trust Company."

The bill of complaint was filed in the forenoon of June 3, 1912. It said that the Trust Company held three notes of the Coal Company. These notes aggregated $330,000. They were. dated February 1, 1912. They had become due April 1st of the same year. One of them, for $290,000, was indorsed by the complainant Hoadley as well as by two other persons. The others had each an individual indorser. They were further secured by the pledge of $1,250,000 of the Coal Company's refunding and improvement "first-mortgage 50-year gold bonds" dated May 1, 1908. These bonds will be called the "third-mortgage bonds." The complainants said that the Trust Company had advertised that it would sell these bonds at 1 o'clock in the afternoon of the day upon which the bill was filed. It is not denied that the Trust Company lent the Coal Company $330,000; that no part of this sum has ever been repaid; that at the time the loan was made neither party thought that the Trust Company was in any wise indebted to the Coal Company; that nothing has since taken place to give the latter any claim upon the former; that the notes were overdue, and that, under their express terms, the Trust Company had the right to sell the bonds when and as it said it was going to sell them. Nevertheless, complainants say that a court of equity should stop the sale. In the summer of 1904 the Coal Company had issued some bonds in exchange for some of its preferred stock. The bonds so put out will be called "second-mortgage bonds." The complainants said that such exchange had never been validly made; that the bonds were invalid; that the Trust Company held a great many of them, and had received interest on them to which it was not entitled, and for which it should account to the Coal Company; that the payment of interest on these bonds had impaired the resources, and thereby injured the credit of the Coal Company; that the Trust Company had participated in the invalid conversion of preferred stock into these bonds, and was liable to respond in damages to the Coal

Company for the injury thereby done the latter, and that, if the third-mortgage bonds were sold while the nominally prior second-mortgage bonds were still outstanding and alleged to be valid, they would not bring anything like as much as they would if their sale was postponed until after the nullity of the second-mortgage bonds had been judicially ascertained and declared. It is necessary to tell the history of these second-mortgage bonds.

In January, 1903, the Coal Company had outstanding $490,000 first-mortgage bonds, $2,500,000 of 7 per cent. cumulative preferred stock, and $2,500,000 common stock. The United States Steel Corporation had recently converted its 7 per cent. preferred stock into 5 per cent. bonds. It was proposed that the Coal Company should follow so distinguished an example. Its business was then apparently flourishing, but for all that it had need of more ready money. Its directors therefore hit upon the plan of putting on their property a second mortgage to secure a bond issue of $3,500,000. Of these bonds $490,000 were to be used to take up the like amount of first-mortgage bonds then outstanding, $2,500,000 were to be exchanged for the outstanding preferred stock, and the remaining $510,000 were to be sold for cash. On January 27, 1903, the stockholders gave their sanction to this scheme. The mortgage was prepared. It bears date May 1, 1903. It was not, however, executed until more than a year afterwards. The delay appears to have been due primarily to what was about that time a growing stringency of the money market. No owner of preferred stock could be forced to make the exchange. The Trust Company itself, at that time a very large holder of such stock, apparently thought that the exchange of stock for bonds would do the Coal Company little good, unless the latter company was able to market the half a million bonds which were intended to bring cash into its treasury. The Trust Company said it would hold on to its preferred stock until the issue of $500,000 bonds was underwritten. In the then state of the financial pulse such underwritings could not be had. On October 9, 1903, the directors decided to postpone indefinitely further efforts to carry out this scheme. They notified the stockholders to that effect. They returned such certificates of preferred stock as had been turned in for exchange. Eight months later business conditions had changed for the better. The directors thought it was worth while to try again. They, however, for some reason thought it best to modify their original plan. They now attempted to extinguish only one-half, instead of all, the preferred stock. Every stockholder as a condition of being allowed to make the exchange was required to subscribe at 90 for bonds which at par were equal to 20 per cent. of the par value of the stock he proposed to turn in. In this altered form the scheme went through. On August 1, 1904, the directors accepted an offer of the Trust Company to furnish all the stock and to take all the bonds which the other stockholders did not. By August 24, 1904, the conversion appears to have been substantially, if not absolutely, completed.

At stockholders' meetings held on November 23 and December 22, 1904, sanction was given to the action or recommendation of the di-

rectors that no more bonds should be issued in exchange for preferred stock; that the $1,250,000 of such stock which had already been exchanged should be canceled as well as the like amount of the second-mortgage bonds originally intended for exchange with the remaining half of the preferred stock. In the resolution of directors and stockholders it was expressly said that the exchange of the stock for bonds already made had been effected under the authority of the action taken at the stockholders' meeting of January 27, 1903. The bonds, of course, were the bonds issued under the mortgage dated May 1, 1903. The mortgage in its turn made equally express reference to the proceedings of the stockholders at their meeting of January 27, 1903.

[1] Some 10 months before this meeting was held, the Legislature of New Jersey had prescribed the way in which a corporation of that state might convert its preferred stock into bonds. Public Laws of New Jersey 1902, p. 217; Dill's New Jersey Corporation Law, § 18a. It was applicable to all subsequent conversions of preferred stock into bonds. Berger v. United States Steel Corporation, 63 N. J. Eq. 823, 53 Atl. 68; Hodge v. United States Steel Corporation, 64 N. J. Eq. 90, 53 Atl. 601.

[2] By its terms no corporation may make such exchange unless for at least one year next preceding the stockholders' meeting at which the exchange is authorized it has continuously declared and paid dividends at a rate exceeding 5 per centum per annum. Complainants say that while the Coal Company's directors for more than a year next preceding January 27, 1903, and continuously thereafter until a period some years subsequent to the meetings of November and December, 1904, voted 7 per cent. dividends to the holders of preferred stock and caused the same to be actually paid, yet these dividends were not in fact earned by the company. It says that under the construction put upon the statutory requirement by the Supreme Court of Errors of New Jersey (Hodge v. United States Steel Corporation, supra) it is not enough to declare and pay dividends, unless those dividends were, in fact, paid out of earnings or out of earnings and surplus. It is not necessary to consider whether the interpretation placed by complainants upon what the court said in the Hodge Case is or is not sound as applied to facts such as those of the case at bar. Complainants have offered no evidence that the dividends paid by the Coal Company were not earned, except the fact that some of the cash actually paid the stockholders was borrowed by the company for the purpose. Before a court would be justified in finding that dividends which have been paid were not earned, far more convincing testimony must be forthcoming. A corporation may have earned money and invested it for proper corporate purposes. If it has, it may borrow cash for the purpose of paying dividends. State v. B. & O. R. R. Co., 6 Gill (Md.) 385. The New Jersey statute, moreover, limits the right to make such conversion to corporations whose floating debt at the time of the stockholders' meeting which authorized the exchange did not exceed 10 per centum of the amount of preferred stock then outstanding. Complainants

say that at the time the stockholders at their meeting voted in favor of the exchange the floating debt of the Coal Company exceeded 10 per centum of the par value of the preferred stock. Before considering whether there is sufficient evidence to support this contention, it will be necessary to determine when the meeting at which the conversion was approved took place.

[3] The complainants strenuously insisted that it was one or the other of the meetings of November 23 or December 22, 1904. The floating debt of the Coal Company at each of the last-mentioned dates was above a quarter of a million of dollars; that is to say, it exceeded 10 per centum of the amount of preferred stock outstanding. Neither one of those meetings answers to the description of the meeting referred to in the statute, for the simple but conclusive reason that at neither of them was any action taken which purported to authorize the exchange of any preferred stock for bonds. All that in this connection was done at these meetings was to vote that some of the stock which the stockholders originally intended to redeem should not be converted. All the exchanges which ever have been made were made some months before these meetings were held. At that time the bonds, the validity of which is now disputed, had been issued. Whether what was actually done can in law be said to have been done under the authority given by the stockholders at their meeting of January 27, 1903, is another question. If it be answered in the negative, the conclusion would follow not that what was done was done by virtue of the resolutions adopted on November 23 or December 22, 1904, but that no authority for what was done was ever given at all. Whether such answer shall be given will be presently considered. The complainants contend that even upon the assumption that what was afterwards done can in law be held to have been done by virtue of the action taken at the stockholders' meeting of January 27, 1903, yet at that time the Coal Company had no lawful power to convert any of its preferred stock into bonds.

[4] It is said that on that day the floating indebtedness of the company exceeded 10 per centum of the par value of its preferred stock then outstanding; that is to say, the floating indebtedness exceeded a quarter of a million. The only evidence to support this contention is an affidavit of the treasurer and auditor of the company. For the purposes of this case, he has gone over the books and accounts of the company to ascertain what its floating debt amounted to on the 27th of January, 1903. To his affidavit he appends a statement showing that such debt on that day as now calculated by him totaled $257,391.66. In this aggregate, are included various sums which may or may not constitute a part of the floating or unfunded indebtedness of the company as those terms are used in the statute. For illustration, there is an item of $3,625.38 for taxes. There is nothing to show whether this amount represents taxes already due, or is a mere apportionment to January 27, 1903, of annual taxes not yet payable. Seven thousand, three hundred and fifty dollars is given as interest on bonds. Apparently this is an apportionment of bond interest not yet due. There is high authority that on coupon bonds such an apportionment should

not be made. Dexter v. Phillips, 121 Mass. 178, 23 Am. Rep. 261. Such accruing interest is not to be taken into account in determining the floating indebtedness of a corporation at a particular time. Epping v. Columbus, 117 Ga. 263, 43 S. E. 803. Fifty-one thousand, eight hundred and sixty-one dollars is said to be what the company owed for pay rolls and salaries. The affiant says that this item was to some extent approximated. The total amount of pay rolls and salaries for January, 1903, is divided by 31, the number of days in that month. The approximate amount due on the 27th of January, 1903, was ascertained by multiplying this quotient by 27. An examination of the calendar will show that in the first 27 days of January were included one holiday—New Year's Day—and four Sundays, while in the last five days of the month there was neither a holiday nor a Sunday. The stockholders' meeting was held in Jersey City at 2 o'clock. It was then about one in Alabama. Were all the wages and salary for the day of the meeting then owing, or were only part of them due, or were none of them? A number of interesting questions as to apportionment and the right to divide days into fractions might be raised. Is the court bound to assume that on the first few days of the month, following, as they did, immediately after the Christmas holidays, as many men were at work as were three or four weeks later? Into such questions it is not necessary here to go. After more than nine years a court of equity will not grant the extraordinary relief here asked for solely upon an affidavit so uncertain, vague, and inconclusive.

The complainants have failed to show that on the 27th of January, 1903, the floating indebtedness of the Coal Company exceeded 10 per centum of the par value of its preferred stock then outstanding. They say it really makes no difference what the condition of the company was on that day, or what its stockholders then did. According to them, what the company subsequently did and did not do combined to extinguish any authority which had been given by the stockholders on that day. The exchange of stock for bonds was not made until 17 or 18 months after the meeting in question.

[5] The statute does not say that the conversion must take place within any particular period. It may be that the lawmakers assumed that, when the stockholders gave such authority, it would be promptly acted upon. Some of the purposes of the act might be defeated if stockholders were at liberty to authorize a conversion when the condition of the corporation was such that the law would permit it to be made without having any present intention to make it, intending merely to secure to themselves the option of doing it, if they would, at a later date when the corporation had ceased to be one which by the law was entitled to turn stock into bonds. Under such circumstances, it may be assumed that any stockholder or creditor who thought that such conversion would do him harm could prevent it. If the intent to evade the statute could be shown, it might be that everything done in pursuance of such unlawful purpose might be held null and void whenever the question came before the courts and in whatever form it was there presented. There is no such state of facts in the case at bar. It is true that the bill alleges that the certificate required by law to the

effect that the floating or unfunded debt of the Coal Company did not exceed 10 per centum of its preferred stock outstanding could not have been truthfully given; that the Trust Company knew that it could not, and for that reason the latter caused such conversion to be made without complying with the law. This is a direct charge that the Trust Company knowingly planned to evade or to defy the law. At the hearing the counsel for the complainants stated that they did not intend that what was said in the bill should be so understood. They explained that all that was meant was that the Trust Company could have found out what the facts were if it had tried to do so, and that the courts were bound to deal with it as if it had known them. It is not necessary here to inquire whether this is one of the cases in which the legal consequences of constructive and of actual fraud are the same. There is no evidence of either except in so far as the existence of the former may be predicated upon the failure to make and record such a certificate as was required by law. That in anything which was done or left undone there was any purpose on the part of the Trust Company, or, indeed, on anybody's part, to get around the law, is not only not proved, but is disproved. It is true that during the year 1904 the floating indebtedness of the Coal Company was usually, if not always, greater than a quarter of a million of dollars. So long as that was the case, no stockholders' meeting was authorized by the statute to direct an exchange of preferred stock for bonds.

[6] Under the circumstances shown in evidence, this fact does not suggest that anybody supposed that the condition of the company during 1904 was such that it would be unfair for it to act under the authority given in January, 1903. While the floating debt during the later year was greater than the maximum prescribed by the statute, it appears that it was well within the power of the company to reduce that indebtedness to a sum within the legal limit. For illustration, on one day when the company owed $323,000, it had in its treasury $115,000 of cash. It then owed more than 10 per cent. of the par value of its preferred stock. But it had it in its power at any moment to reduce that indebtedness to less than 10 per cent. A court will not lightly presume that anybody seeks to evade the law when literal compliance with it is so easy.

[7] No stockholder can be compelled to surrender his stock for exchange. It follows that in almost every case in which a corporation has more than a handful of stockholders a considerable time must elapse between the authorization of the conversion and its completion. Under the circumstances of this case, there is no reason to hold that the delay of 18 months is unreasonably and improperly long.

[8] The action of the directors in voting to postpone indefinitely the carrying out of the plan and in returning the shares of preferred stock deposited under it did not necessarily abrogate it. In view of the position taken by at least one very large stockholder, it could not be carried through unless $500,000 of the bonds could be marketed. That could not be then done. When it could be was uncertain. All that could be done was to wait.

[9] It is urged, however, that the plan approved by the stockhold-

ers was never carried out. By the action of the directors ratified after the fact by the stockholders a different one was substituted for it. On January 27, 1903, every holder of preferred stock was given the absolute right to exchange all of it for bonds. In July, 1904, he was told that he might not convert more than one-half of it, and not even that much unless he bought at 90 an additional number of bonds equal in par value to 20 per cent. of the preferred stock offered by him for exchange. It may well be that any preferred stockholder who wished to exchange all his preferred stock for bonds might have had the right to do.so in spite of the action of the board of directors. If he did not complain, however, it does not appear that any one else has the right to do so. These exchanges were completed nearly eight years ago. Until the filing of this bill no one has ever attacked them. It is too late for any one now to do so. No state law forbids a corporation to exchange fewer shares of preferred stock than it once proposed to do. There is nothing in such course of conduct against the policy of the state as embodied in its laws. No one, except the corporation and its stockholders, are concerned as to whether all the stock was redeemed or only part of it. No one of them could now upset what was done even in an action at law, much less could any of them attack it in equity. Breslin v. Fries-Breslin Co., 70 N. J. Law, 274, 58 Atl. 313. To the exchange of stock for bonds the complainants make another objection which has greater foundation in fact.

[10] The law of New Jersey required, and requires, that whenever such exchange is sanctioned by the stockholders of a corporation certain officers of it shall make and file with the Secretary of State a certificate showing, among other things, that the floating or unfunded indebtedness of the corporation did not exceed 10 per cent. of its capital stock then outstanding. This requirement was added by the act of 1902 before mentioned. The officers of the Coal Company did file a certificate in a form sufficient before the last-mentioned year. It did not contain the statement first called for by that enactment. As between the parties to this cause, what effect has such an omission upon the validity of the bonds issued in exchange for the preferred stock? If the Coal Company could in any way have ratified the irregular issues, it has done so. If it could in any wise estop itself from questioning their binding obligation, it has done so. Since these bonds were put out the company has made and has caused to be printed and distributed at least six annual reports. In these the bonds in question were included among its valid outstanding obligations. On May 1, 1908, it put a third mortgage upon its property. There were the usual preliminary meetings and resolutions of directors and stockholders. In all of them, as well as in the third mortgage itself, the validity and priority of these bonds was repeatedly and expressly recognized. During the last two years there have been various negotiations between the company and other persons with reference to a proposed sale of the company's property or to a proposed merger of the company with another. In all these negotiations and in all the propositions made by the Coal Company the statement was re-

peatedly made that its property was subject to the lien of the bonds issued for the redemption of the preferred stock. For more than seven years these bonds have been bought, sold, exchanged, and pledged without their validity being in any wise questioned.

All this complainants confess, but seek to avoid. In making the exchange of bonds for preferred stock without making and recording the certificate required by law, they say the Coal Company attempted to do something ultra vires, and therefore void. They assert that the contract between the holders of preferred stock and the company by which the stock was converted into bonds was beyond the powers of the company. They quote:

"Having entered into the agreement, it was the duty of the company to rescind or abandon it at the earliest moment. * * * Though they delayed its performance for several years, it nevertheless was a rightful act when it was done." Thomas v. Railroad Co., 101 U. S. 86, 25 L. Ed. 950.

Upon this rock they claim to found their case. Is that case one which can be placed upon such a foundation?

A thing done or attempted by a corporation may be unlawful for any one of at least three different reasons. First, the bargain may be contrary to sound morals or to the public policy of the state as declared by its legislation or its courts. If it is, the agreement will be absolutely unenforceable, precisely as would be a similar contract of an individual. The latter, when seeking city contracts, could no more lawfully agree to pay a member of the municipal board charged with the duty of awarding such contracts an annual salary in consideration of the exercise of such member's influence in the board on his favor than could a corporation. If such salary had been in fact paid for a number of years, neither the individual, if he had paid it, nor a corporation, if the money had come out of its treasury, could recover it back. The reason would be the same in either case.

It is here immaterial to inquire what would be the rights of persons who were stockholders of the company at the time the salary was paid, but who were ignorant of its payment, or how, if they have any rights, they could assert them. No such stockholders are before the court. The fact, if it be a fact, that a majority of the stock of the Coal Company is now held by different persons than those who held it when the conversion took place, is legally unimportant. The corporation remains the same. Old Dominion Copper Co. v. Lewisohn, 210 U. S. 206, 28 Sup. Ct. 634, 52 L. Ed. 1025. Moreover, if, to use the phrase of Mr. Justice Holmes in that case, the facts in this are approached from a business standpoint, none of the new stockholders have cause for complaint. When they bought their holdings, the conversion had been completed. They knew that the preferred stock of the company had been reduced, its bonds increased, and by what amount. It has not been quite easy to understand whether the complainants claim that the exchange of bonds for preferred stock was an agreement of the class which is against good morals and public policy. If such contention is made, it cannot be sustained.

[11] A transaction which the statutes of the state expressly authorize does not become immoral or subversive of the settled policy of the state as those words are here used merely because the officers of a corporation fail to file a certificate in the form required by law. If the contention were sustained, it would be fatal to the relief for which complainants ask. The court would leave all the parties to such a forbidden transaction where it found them.

The second class of unlawful contracts are those which a corporation has no power to make at all; such, for example, as to lease its franchises to another, to increase its capital beyond the amount limited by its charter, to engage in transactions altogether foreign to the purposes for which it was chartered. It would be better if the phrase "ultra vires," as used in connection with corporate transactions, be limited to this sort of attempted agreement.

[12] In this class of cases, as in the first, the courts of the United States will refuse to enforce the invalid contract. Rights of action or of defense cannot be predicated upon it. There is, however, nothing essentially immoral in the transaction. The courts will strive to do justice between the parties so far as that can be done without in any wise relying upon the invalid bargain. Central Transportation Co. v. Pullman's Palace Car Co., 139 U. S. 59, 11 Sup. Ct. 478, 35 L. Ed. 55.

[13] If such a contract has been completely executed upon both sides, the courts will ordinarily refuse any relief to either. The usurpation is at an end. Each party has received from the other what he bargained for. Neither of them has any cause to complain. The contract has ceased to be a living thing. The courts will leave it in its grave. In this case the preferred stock was turned in to the Coal Company nearly eight years ago. More than seven years ago the Coal Company destroyed certificates representing it. The bonds were issued in the summer of 1904. They have since been outstanding. It may well be argued that the agreement for conversion has been completely performed. There is no question that such would be the holding of the New Jersey courts. Camden & Atlantic R. R. Co. v. Mays Landing R. R. Co., 48 N. J. Law, 559, 7 Atl. 523. It is unnecessary to inquire whether under the federal decisions such should be the ruling of this court. The transaction assailed in this case was not one into which the corporation had no power to enter. That power was expressly conferred upon it by statute. Berger v. United States Steel Corporation, supra; Hodge v. United States Steel Corporation, supra; Allen v. Francisco Sugar Co. (C. C. A. 3d Circuit) 193 Fed. 825.

[14] The agreement of conversion in this case belongs to the third class of corporate contracts which are sometimes said to be ultra vires, though the phrase as applied to them is scarcely accurate. In them the power exists to do what was done, provided that the corporation does it in a certain prescribed way. In such cases the corporation will be estopped to deny that it did not do it in the statutory way as against other persons who have acted upon the assumption that the corporation had done what the law said it should

do.  Handley v. Stutz, 139 U. S. 425, 11 Sup. Ct. 530, 35 L. Ed. 227.  The facts in this case estop the Coal Company from denying the validity of the bonds if the policy of the law of the state will allow an estoppel to be raised.  How far a corporation or its stockholders may be forbidden to question the validity of corporate acts which are said to be in disobedience of, or in want of conformity to, the state statutes, must obviously depend on the policy of the state. In the New Jersey courts no such consequences as are contended for by complainants would be allowed to follow upon even more serious breaches of the statutes of that commonwealth.  Arnold v. Searing, 73 N. J. Eq. 268, 67 Atl. 831; Breslin v. Fries-Breslin Co., supra; Camden & Atlantic R. R. Co. v. Mays Landing R. R. Co., supra; Camden Safe Deposit Co. v. Citizens' Ice Co., 69 N. J. Eq. 718, 61 Atl. 529.

Complainants say that the consequences which will follow from the entering by a corporation into an ultra vires contract is a question of general law upon which the federal courts will follow their own decisions, irrespective of what the state courts may do.  Upon the facts of this case it is not necessary to question this contention, but, if it be sound at all, its application must be carefully limited, unless the federal courts are to put themselves with reference to the enforcement of the state laws in a position akin to that of those legitimists who are more royal than the king; of those Catholics who are more papal than the Pope.

[15] The only reason for holding void illegal or ultra vires contracts of state corporations made and to be performed within the state of their incorporation is that to give them validity would be contrary to the policy of the state.  It is for the state courts to declare what that policy is.  On this branch of the case the conclusion of the whole matter is that the Coal Company is estopped to question the validity of the bonds which eight years ago it issued in exchange for its preferred stock.  The other complainant, Hoadley, based his right to attack them upon the ground that he was a stockholder of the Coal Company.  It is now admitted that he is not. He has no claim to be heard.

Thus far the case has been discussed upon the assumption that, if the second-mortgage bonds held by the Trust Company are invalid, the Coal Company would be entitled to the injunctive relief for which it asks.  Is this assumption well founded?

[16] He who seeks equity must do equity.  Years after the exchange of preferred stock for bonds had been made the Coal Company sought to borrow $330,000 cash from the Trust Company.  The borrower had then every means of knowing whether it ever had filed in the office of the Secretary of State the certificate in question or not.  It then knew that the Trust Company held a very large amount of the second-mortgage bonds.  It did not suggest that it had any claim in consequence upon the Trust Company.  If such claim had been made, it is safe to say that the loan of $330,000 for which it asked would not have been made.  When it borrowed the money, it pledged as collateral for the repayment thereof a million and a

quarter of its third-mortgage bonds. There is no question but that these bonds are valid. The deed of trust under which they were issued expressly recognized the validity of the prior second-mortgage bonds. The Coal Company did not pay this $330,000 when it was due. The Trust Company waited for more than two months after payment should have been made. It sought to exercise its unquestioned right of selling the collateral pledged for that loan. The Coal Company comes to a court of equity, and asks that such sale shall be enjoined because of transactions which took place years before the loan was ever made and which had no connection with the loan. It made no tender into court of the amount which it had borrowed from the Trust Company or of any part thereof, nor did it offer any security to pay whatever sum might be found due by it upon the accounting for which it asked. Under such circumstances, the injunction might well have been refused without going at all into the question of the present validity of the second-mortgage bonds. A very able and vigorous attack has been made upon those bonds. To have placed the decision of the case altogether on other grounds, however conclusive those other grounds might have been, might have suggested that there was a more serious question as to the validity of these second-mortgage bonds than in the view of this court is true.

The preliminary injunction asked for is therefore refused, and the restraining order heretofore granted dissolved.