NATIONAL BANK OF COMMERCE IN ST. LOUIS, Appellant, v. DAVID R. FRANCIS et al.

In Banc, December 20, 1922.

1. **PARTNERSHIP: Sharing Profits.** It is not sufficient to create a partnership that the parties to an agreement were to share the profits of a given enterprise; to become partners they must have agreed and intended to share the losses and become partners. An agreement for the re-organization of a railroad and for the organization of a construction company to complete the construction of its lines and extensions, signed by certain persons denominated a committee, in which it was stipulated that "all profits made by such construction company shall, under proper contract to be made by the committee, be paid to the committee for the benefit of holders of certificates of interest," did not make the members of the committee liable as partners for the payment of the notes issued by said construction company, whether or not it was a dummy corporation used by them as their agent to make such notes; and particularly so where in said agreement elaborate provisions were made to avoid all liability on their part for all construction work, said agreement containing, among other provisions, one for the organization of a construction company to do such work and to issue its notes to raise money therefor, and another specifying the form and terms of said notes, whereby all liability for their payment was carefully limited to the securities pledged, the net earnings of the railroad, as re-organized and extended, and the unexpended funds derived from the sale of said notes.

2. ————: **Estoppel.** Plaintiff cannot hold defendants liable as partners unless they are partners in fact *inter sese*, or they have held themselves out as partners and plaintiff has acted upon such representation and paid out money in reliance thereon.

3. **SUBSCRIPTION AGREEMENT**: Reference to Other Document: Inquiry. Frequent reference made in the subscription agreement for the issue, sale and use of notes to be issued by a construction company, which plaintiff signed, to another agreement, was notice of such other agreement and put plaintiff upon inquiry to ascertain its contents, and plaintiff, in its suit upon notes so issued, is chargeable with actual knowledge of all he would have learned by such inquiry.

4. **ULTRA VIRES CONTRACT**: Recovery of Money Paid Out. Money paid out by a national bank on an *ultra vires* contract, fully executed and containing nothing immoral or prohibited by law, cannot be recovered back.

5. ——: Purchase of Notes. The National Bank Act authorized a national bank to discount and negotiate promissory notes and other evidence of debt and to loan money on personal security; and there is nothing *ultra vires* in the purchase and discount of the notes of a construction company, although said company make no absolute promise to pay them, and the only security or means of payment provided is the sale of the stock and bonds of a railroad, its net earnings, and other pledged funds. While such notes are not, strictly speaking and in every sense, ordinary promissory notes, they are evidences of debt, and the pledged stocks and bonds are personal security.

6. **DUMMY CORPORATION**: Liability of Organizers for Notes. Although a construction company, organized for the construction of a railroad, was a dummy corporation, used by its organizers to obtain money for them to be used in said construction, they cannot be held liable to pay its notes unless it could itself be held liable under its agreements; and where the notes limited the right of the holder to institute only such proceedings against the maker as were necessary to reach and apply the bonds and stocks of said railroad, pledged for the payment of such notes, and further expressly provided that "no judgment or decree which may be rendered in such proceeding, or otherwise, upon this note or any agreement or covenant contained therein, shall be enforced against the signer hereof or its stockholders, or against any member of said organization committee individually, or against his individual property," the holder of such notes cannot have a personal judgment against said organizers for the amount of money paid for them.

7. ——: ——: Money Had and Received. And since the plaintiff bank received all it contracted to receive at the time it purchased said notes, namely, its share of the stock, bonds and net earnings of the railroad and other pledged funds, it cannot, by a suit for

National Bank of Commerce v. Francis.

money had and received, obtain against the defendants, who organized the dummy corporation which executed and sold the notes, wherein it assumed no obligation to re-pay the money received therefor, a judgment for the amount of money it paid for said notes.

Appeal from St. Louis City Circuit Court.—*Hon. J. Hugo Grimm,* Judge.

AFFIRMED.

*George L. Edwards* for appellant.

(1) The first count of the petition states a cause of action on the notes of the Allegheny Improvement Company. The bondholders of the St. Louis & Northern Arkansas Railroad Company were and are principals or partners in acquiring and extending that property. 1 Romley on Modern Law Partnership, sec. 160; 30 Cyc. 397-398; Martin v. Fewell, 79 Mo. 401; Bank v. Altheimer, 91 Mo. 195; Torbert v. Jeffrey, 161 Mo. 645; Nugent v. Armour Packing Co., 208 Mo. 481; Beauregard v. Case, 91 U. S. 134; Meehan v. Valentine, 145 U. S. 611; Cleveland Paper Co. v. Courier Co., 67 Mich. 162. (2) The notes of the Allegheny Improvement Company are, in fact, what the principals represented them to be, "notes." Indeed, they are negotiable promissory notes, and, of course, there must be a maker liable for their payment. If there were no maker liable for their payment they would not be notes—not even non-negotiable, much less negotiable promissory notes. Every note, whether negotiable or non-negotiable, must have a maker, without which it is not a note, negotiable or non-negotiable. Secs. 788, 970, 980, 846, R. S. 1919; Story on Promissory Notes (7 Ed.) p. 2; 1 Daniel on Negotiable Instruments (6 Ed.), sec. 28; 8 Corpus Juris, Secs. 80, 93; Bouvier's Law Dictionary, p. 2744; 3 Words & Phrases (Second Series) p. 1261; Bick v. Clark, 134 Mo. App. 544. (3) If it is not clear from their face that the bondholder-principals are liable on the notes of the

Allegheny Improvement Company, then at least there is doubt about who is liable on these notes. On their face they exempt the Allegheny Improvement Company, its stockholders and the agents. Since the signer, the Allegheny Improvement Company, is exempt from liability, it is clear that the real maker for whom the Allegheny Company acted, or was used, may be shown by parol evidence. In other words, it is permissible to show who were acting under the assumed name of the Allegheny Company. Sec. 805, R. S. 1919; Sparks v. Dispatch Transfer Co., 104 Mo. 531; Bank v. Lead Co., 173 Mo. App. 634. (4) The principals expressly authorized the agents to extend the property of the St. Louis & North Arkansas Railroad Company and to borrow the necessary money for that purpose on notes of the Allegheny Improvement Company. Subdivisions (d), (e), (f), (h), (i), third paragraph, Principals' Agreement. (5) Where parties put forward a corporation, whether real or pretended, to act as their agent in the conduct of their business from which they are to derive the profits and the benefits, the courts will look right through the corporation to the principals and hold the principals liable for the engagements of the corporation contracted in the conduct of their business. This is an elementary rule of the Law of Agency. Phillips v. Frisco Railroad, 211 Mo. 419. (6) The principal who has accepted and appropriated the fruits and benefits of the action of an agent cannot hold on to such fruits and benefits and repudiate the agent. It is an elementary proposition that a party cannot grasp the benefits of a contract with one eager hand, while thrusting aside its burdens with the other. The burden and the benefit must go hand in hand. 31 Cyc. 1267; Kirkpatrick v. Pease, 202 Mo. 471, 489. (7) The great majority of the bondholder-principals, if not all, were subscribers to the agents' agreement, and, through it, loaned moneys to the partnership, taking therefor the notes of the Allegheny Improvement Company. If there was any doubt about the authority of the

agents to borrow money on these notes for the bond-holder-principals and give their promise to pay the same, to be used in the conduct of the partnership enterprise, the power of the agents to do so was ratified and approved, at least, by all of the bondholder-principals who were subscribers to the agents' agreement. (8) The second count in the petition states a cause of action unless the bondholder-principals are liable for the payment of the notes of the Allegheny Improvement Company. Because in the event they are not liable for their payment, then no one is liable for their payment, and these notes represent in fact only a participation in a speculative railroad enterprise. That is, they are not notes at all, mere certificates of participation in or beneficial interest in a speculative railroad enterprise. The plaintiff, a national bank, had no power to loan and the bondholder-principals no power to borrow its money for use in such enterprise. If this is the correct interpretation of these contracts and the notes issued pursuant thereto, it was an *ultra vires* transaction in so far as the bank is concerned, and it follows the bank is entitled to recover its moneys from those who obtained and appropriated them through such transaction. Sec. 9661, 9 U. S. Complied Statutes (1916); Rev. Stats. U. S. sec. 5136; Bank v. Mathews, 98 U. S. 621; Bank v. Kennedy, 167 U. S. 362; Bank v. Hawkins, 174 U. S. 364; Bank v. Converse, 200 U. S. 425; Bank v. Wehrmann, 202 U. S. 295; Rankin v. Emigh, 218 U. S. 27; 7 Corpus Juris, sec. 798; Day v. Spiral Springs Buggy Co., 57 Mich. 146; Bank v. Bank, 173 Mo. 153.

*Jourdan, Rassieur & Pierce* for respondents.

(1) The bondholders depositing their bonds under the terms of the Re-organization Agreement did not thereby become partners. (a) They cannot be held liable as partners by estoppel, because the petition does not charge an estoppel, and because, under the facts pleaded, there is no estoppel. 1 Rowley on Modern Law of Partnership, sec. 91, pp. 98 and 99, and sec. 95, pp.

101 and 102; Mock v. Stoddard, 177 Fed. 611, 616. (b) They cannot be held to be partners by agreement, because there is no such agreement. 1 Rowley on Modern Law of Partnership, sec. 103, pp. 109 and 110; Elliott on Contracts, sec. 474; Mackie v. Mott, 146 Mo. 230. (c) The Re-organization Agreement expressly, or at least by fair implication, discloses an intention on the part of the depositing bondholders not to become partners. Re-organization Agreement, par. 3, sec. b. (2) The depositing bondholders never authorized the committee to pledge their personal credit in raising the money to construct the extensions. Re-organization Agreement, par. 3, sec. b. (3) The committee did not in fact borrow money on the personal credit of the bondholders or anyone else. They never assumed any such power. The sole security which they gave or agreed to give was the property described in the pledge agreement. See subscription agreement. (4) The notes of the Allegheny Improvement Company subscribed for by appellant contained no promise of the depositing bondholders, express or implied, for their payment. See Allegheny Improvement Company notes. (5) The notes are either non-negotiable notes or valid contracts evidencing a debt. 8 Corp. Jur. 41; McGee v. Larramore, 50 Mo. 425. (6) In either event they were within the power of a national bank to purchase by discount. 9 U. S. Complied Statutes 1916, sec. 9661; National Bank of Nashville v. Stahlman, 178 S. W. 942, syl. 3; Germania National Bank v. Cates, 99 U. S. 628, 633, 25 L. Ed. 448; McBoyle v. Union National Bank, 122 Pac. 458; First National Bank v. National Exchange Bank, 39 Md. 600; Westminster National Bank v. New England Electrical Works, 3 L. R. A. (N. S.) 551. (7) The transaction whereby the bank acquired these notes was "discounting" within the meaning of the National Bank Act. Bank v. Johnson, 104 U. S. 271, 26 L. Ed. 742, 744; 3 Words and Phrases, 2089. (8) Where a national bank buys notes and pays for them, it cannot rescind the contract thus fully performed

and executed, and by pleading its own wrong, seek to recover the purchase price. 3 Michie on Banks and Banking, sec. 262, pp. 2009-2012; 14a Corp. Jur. p. 319; Attleborough National Bank v. Rogers, 125 Mass. 339; Chapin v. Merchants National Bank, 47 Hun, 637; Schlitz Brewing Co. v. Mo. Poultry & Game Co., 287 Mo. 400.

*Jeffries & Corum* for other respondents.

(1) Suit cannot ordinarily be maintained against a person whose name does not appear on the note as obligated to pay it. R. S. 1919, sec. 805; Sparks v. Dispatch Transfer Co., 104 Mo. 541; Bank v. Lead Co., 173 Mo. App. 642. (2) Plaintiff seeks to avoid the application of the above rule by asserting the existence of a partnership. But defendant and other subscribers to the reorganization or depositing agreement are shown by the petition not to be partners. 2 Corpus Juris, p. 425; Mackie v. Brady, 208 S. W. 151; Hughes v. Ewing, 162 Mo. 261; Mackie v. Mott, 146 Mo. 230; McDonald v. Matney, 82 Mo. 365; Kellogg v. Farrell, 88 Mo. 594. (3) The underwriting agreement signed by plaintiff, by its terms, takes full cognizance of the provisions of the depositing agreement. Plaintiff, therefore, stands charged with full notice of all the provisions of the latter agreement and is bound by the *inter sese* contract therein presented. (4) Defendants, as bondholders who subscribed to the agreement of February 15, 1906, did not thereby give the committee or any other person authority to bind them personally for the payment of any loan made to secure funds to extend the railroad. The notes held by plaintiff being for extension purposes, plaintiff cannot under the provisions of the agreement look to defendants personally for payment. (5) Plaintiff is bound by the terms of an express contract wherein the committee did not borrow the money on the personal credit of the bondholders or anyone else, and the fact that the construction company was without capital will not relieve

plaintiff. Being advised of all the frailties of its contract and of the parties thereto, no relief can be afforded it other than such as is given by the contract. Biggs v. Westen, 248 Mo. 333; Berry v. Rood, 168 Mo. 316; 7 A. L. R. p. 973; Scott v. Luehrmann, 213 S. W. 855. (6) The act of plaintiff in subscribing to the underwriters' agreement was not *ultra vires,* but were it *ultra vires,* plaintiff, having received the notes and the agreement being fully performed, cannot assert a wrongful act committed upon its own part in order to justify a recovery. 3 Fletcher's Ency. Corporations, sec. 1559; Kerfort v. Bank, 54 L. Ed. 1042; Sec. 9661, 9 U. S. Comp. Stat. 1916. (7) For the same reasons and upon the strength of the same authorities, plaintiff's second and third counts fail to state a cause of action. (8) The notes executed by the Allegheny Improvement Company and held by plaintiff constitute the obligation of that company payable out of certain securities, and not out of other assets of the company, and although they may be said to be non-negotiable, they are, nevertheless, the notes, i. e., the obligations of the construction company, with an agreed limitation as to the source of payment and value of the collateral securing their payment. 8 Corpus Juris, p. 121; Bank v. Lightner, 8 L. R. A. (N. S.) 231. (9) The bonds of the railroad company securing these Allegheny Improvement Company notes, were the unconditional promise of the railroad company and were unquestionably negotiable, and it will be presumed that as plaintiff understood all of the circumstances, it purchased the Improvement Company notes under the then admitted and respected value of the obligations of the railroad company, which were negotiable, and held as security for the payment of the notes. This cannot constitute an *ultra vires* act. (10) Respondents are not liable on the third count of the petition to appellant in an action for money had and received. Clifford Banking Co. v. Donovan Com. Co., 195 Mo. 262; Lang v. Friedman, 166 Mo. App. 354; Bruer v. Dunham, 209 S. W. 573.

*A. & J. F. Lee, Thomas S. McPheeters* and *Bryan, Williams & Cave* for other respondents.

(1)   The relation of partnership was not created by the re-organization and did not exist between the bond-holders who signed the Re-organization Agreement. Elliott on Contracts, sec. 476; Mock v. Stoddard, 177 Fed. 611; Fuel Co. v. Brady, 202 Mo. App. 551; Hughes v. Ewing, 162 Mo. 261; Mackie v. Mott, 146 Mo. 230; Chapin v. Cherry, 243 Mo. 375.   (2)   The bondholders who were subscribers to the Re-organization Agreement  did  not  authorize  the  committee  to  pledge their credit.   (3)   And, further, the committee did not at any time pledge the credit of the bondholders who had signed the Re-organization Agreement. Allegheny. Improvement Company notes; Underwriting Agreement; Indenture of Pledge.   (4)   The Bank of Commerce, in signing the subscription agreement, contracted for ,notes or contracts of the Allegheny Improvement Company, and did not contract for the notes or contracts of the defendants, or of anyone else, and the bank received just what it contracted for, and has no ground of complaint. Underwriting Agreement; Allegheny Improvement Company notes; Indenture of Pledge.   (5)   One who, dealing with an agent with full knowledge of the principal, accepts the note or contract of the agent, thereby elects to look solely to the agent and cannot hold the principal. 2 C. J. 836; Ames Packing Co. v. Tucker, 8 Mo. App. 95; Hughey v. Truitt, 196 S. W. 1065; Warehouse Co. v. Meade, 181 S. W. 1060; Carman v. Harrah, 182 Mo. App. 365; Shepflin v. Dessar, 20 Mo. App. 565; Merrill v. Weatherby, 120 Ala. 418; Brown v. Tainter, 114 App. Div. (N. Y.) 446; In the Matter of Bateman, 7 Misc. (N. Y.) 633; Hyde v. Paige, 9 Barb. 150; Ferguson v. Bean, 14 L. R. A. 65; Paterson v. Gandasequi, 3 Smith's Leading Cases (9 Ed.).   (6)   The contract by which the bank bought, paid for and received the Allegheny Improvement Company notes having been fully performed,

it cannot now plead its own wrong and recover the purchase price. Alabama Coal Co. v. Trust Co., 197 Fed. 347; San Antonio v. Mehaffy, 96 U. S. 312; 3 Michie on Banks & Banking, sec. 262; Attleborough National Bank v. Rogers, 125 Mass. 339; 14a C. J. 319; Schlitz Brewing Co. v. Missouri Poultry & Game Co., 287 Mo. 400; Union National Bank v. Matthews, 98 U. S. 621; Kerfoot v. Bank, 218 U. S. 281; Thomas v. Railroad Co., 101 U. S. 71; 3 Fletcher's Ency. Corporations, sec. 1559, p. 2631; First National Bank v. Stuart, 107 U. S. 676.

SMALL, C.—The petition of the plaintiff, a national bank, to recover a money judgment against the defendants, is in three counts. First, it seeks to hold defendants as partners. Second, to set aside the transaction under which the money was paid out by the plaintiff, as *ultra vires* the plaintiff, as a national bank, and to recover same from defendants under an implied contract to repay said money. Third, to hold defendants liable as for money had and received.

The three counts are based upon the same transaction, to-wit, the purchase by the plaintiff on October 1, 1906, of 525 notes (so called) of the Allegheny Improvement Company, for $1000 each, which company the petition alleges, in effect, was a dummy corporation used by defendants as their agent to make said notes as a construction company, in pursuance of a re-organization agreement of the defendants, who were first-mortgage-bondholders of the St. Louis & North Arkansas Railroad Company, and who had caused said mortgage to be foreclosed and had purchased the property of said railroad company at the foreclosure sale, through a re-organization committee. The allegations of the petition in this regard are as follows:

"For the purpose of making said extensions of said property the agents used a pretended corporation, known by the name of the Allegheny Improvement Company, Said company was organized or adopted and used for

the purposes for which a construction company was directed to be organized or adopted and used by the Principals' Agreement, and pursuant thereto. Said company was organized or adopted and used by the agents, in the exercise of the powers conferred upon them by the Principals' Agreement. The agents appointed or elected the shareholders, directors and officers of said company from time to time, none of whom had any financial interest in said company. Said company never had any actual paid-up capital, and never owned any property of any kind or character. Said company had no real independent existence, and was a corporation in name only, being solely the instrument and hand of the agents. The agents caused said company to contract with the railroad company selected by them for the extension of said property east and west, in consideration of said railroad company paying to said construction company for the use and benefit of the principals $25,000 par value of its stock and $25,000 par value of its first-mortgage bonds for each mile of road so constructed.''

The petition further states "that plaintiff has always relied for the re-payment of said moneys upon the notes of the Allegheny Improvement Company.'' The petition also shows that no interest was paid on said Allegheny Improvement Company notes after October 1, 1909, and that the principal thereof came due October 1, 1911. This suit was filed April 8, 1918.

Defendants filed a demurrer to each count in the petition setting forth two grounds, first, that it failed to state facts sufficient to constitute a cause of action against defendants, or either of them, and, second, that it appears upon the face of each count that the cause of action attempted to be alleged therein was barred by the Statute of Limitations.

The court sustained said demurrer, and plaintiffs refusing to plead further final judgment was rendered in favor of the defendants, from which plaintiff appealed to this court.

By an agreement of counsel in the lower court, and continued here, the exhibits referred to in the petition are deemed part of the petition and are to be so considered in disposing of the demurrer. Said exhibits are very voluminous and are four in number.

Number one may be denominated the Bondholders' Re-organization Agreement. It recites the default of the St. Louis & North Arkansas Railroad to pay its interest due on the bonds, July 1, 1905, and January 1, 1906, and that its then existing road would not produce revenues enough to pay expenses, and that this condition could only be relieved by an extension of its lines, to connect with Joplin, Missouri, on the west, and Helena, Arkansas, on the east, which extensions were estimated to cost $5,000,000. That some of the bondholders were unwilling to subscribe toward the fund necessary to make such extensions, and the railroad company could not raise the necessary money without the co-operation of the majority of its first-mortgage bondholders, who had requested the trustees in the mortgage to foreclose the same, and that to protect the interests of the bondholders it was necessary to appoint a Re-organization Committee. Therefore, the parties signing said agreement mutually agreed, first, to forthwith surrender their bonds and coupons to the Union Trust Company of St. Louis, as depositary, subject to the order of the Committee of Re-organization, second, for which the Trust Company would issue to each bondholder a certificate of beneficial interest, in a certain prescribed form, third, that John Scullin, D. R. Francis, Robert S. Brookings and R. C. Kerens should be the Committee of Re-organization and empowered: (a) To bid in the property and franchises of the railroad company at the foreclosure sale and use the bonds and coupons of the subscribing bondholders in payment of such part of the purchase price as permitted by the decree of the court. (b) To have full power to execute a temporary mortgage upon the railroad so purchased "for the purpose of rais-

ing money to pay into the registry of the court" the necessary sum to pay ratably other bondholders not parties to the Re-organization Agreement, and costs of the foreclosure proceedings, including masters and attorneys' fees, "or to bind the subscribers hereto severally in the proportion of their interests as represented by the certificates of beneficial interest issued to them for the payment of money borrowed by said committee to be used for the aforesaid purposes, but to no greater extent, it being expressly understood that the subscribers hereto shall be held as security for such sum as the committee may borrow for the purposes aforesaid, only in the event a temporary mortgage upon the property purchased is not executed, and then only severally to the extent alone of their ratable share of said loan." (c) Committee to collect proceeds for bondholders in case third party purchased at foreclosure sale. (d) "If the committee becomes the purchaser of said property the members thereof shall, as trustees and agents of the subscribers, hereto forthwith reorganize the company in accordance with the provisions of the statutes of the States of Arkansas and Missouri relating to the reorganization of railroad companies by purchasers at judicial sales." (e) For the purpose of controlling the stock and bonds of the companies which may construct the proposed extensions, the committee shall make such contract with the Southeastern Railroad Company for constructing the eastern extension as is necessary "to acquire the ownership of said railroad as trustees and agents of the subscribers hereto," or may incorporate another company to acquire its property rights and franchises; the committee shall also cause to be organized, a corporation in Missouri "for and on behalf of the subscribers hereto," for extension westward to Joplin. Said committee also to have power to sell the property and franchises of the re-organized company to any construction company and undertake with such purchasing company to cause to be constructed said extensions, upon

the purchasing company agreeing to issue and deliver to the committee all the stock and bonds of the entire line when completed, including the line of the St. Louis & North Arkansas Railroad Company, as re-organized, for not less than an issue of $25,000 per mile, each of stock and bonds, and said committee shall have power to cause the St. Louis & North Arkansas Railroad Company, as re-organized, to purchase any such construction company, or to consolidate said re-organized St. Louis & North Arkansas Railroad Company, with any such construction company upon such terms as the Committee may deem "best for the subscribers hereto." (f) Said committee to have power to cause a construction company to be organized for the "benefit of the subscribers hereto," and cause said company to make contracts with the company undertaking to build said extensions for the stock and bonds received by said construction company from the railroad company as consideration for building such extensions. "All profits made by any such construction company shall, under proper contract to be made by the committee, be paid to the committee for the benefit of the holders of the certificates of interest." (g) Committee may buy the bonds of bondholders not parties to Re-organization Agreement, and use same in payment of purchase price at foreclosure sale. (h) Committee to use all bonds and stocks received by it "under any of the contracts aforesaid which in its option it is authorized to make for and on behalf of the subscribers hereto," except such as it may retain to reimburse itself for money borrowed to pay purchase price of the property and costs of foreclosure sale, "as collateral security for loans made to construct said proposed extensions upon the terms and conditions hereinafter set out." (i) The committee, in order to secure funds for building and equipment of said extensions, shall have power to pledge all the stock and bonds issued upon the existing line and extensions of said railroad "as security for loans made to it, or to the construction

or railroad company engaged in the construction of said proposed extensions'' (except such as may be retained under clause ''h'' hereof) ''and it shall deposit all of said bonds and stock with a trustee, to be held by said trustee as security equally and without preference of one loan over another. The loan so made shall be evidenced by notes all payable at the same date, the first of said notes executed for the first advances made, to be due and payable five years from the date of said advance, and all of said notes shall bear interest payable semiannually at the rate of five per cent per annum, said semiannual interest payments to be evidenced by coupon interest notes attached to the principal notes. Each of said notes shall contain a provision that the maker thereof shall have the right to pay the same at the date of the maturity of any interest coupon, if notice of the intention of the maker thereof to so pay it is given to the trustee holding the security —––— days or more before the maturity of said semiannual interest coupon. None of said notes shall be discounted at more than five per cent of their face value; and the subscribers hereto and such bondholders as may hereafter become parties hereto shall have the privilege and right to subscribe for the purchase or discount of said notes in advance of the issuance thereof in an amount not exceeding twice the par value of their present holdings of the bonds of the said St. Louis & North Arkansas Railroad Company, upon as favorable terms as are accorded other purchasers, and shall be bound by said subscription when the same is filed with the said trustee.'' (j) The net earnings of the existing line and extensions when completed shall be used by the committee to pay interest on the construction notes, and any deficiency to be paid out of money borrowed or received on sale or discount of such notes. If earnings exceed accruing interest, the excess shall be applied in retiring the construction notes. (k) Committee empowered, subject to approval of majority of holders of beneficial certificates, to sell the

property of the St. Louis & North Arkansas Railroads as re-organized, and all rights and interests of the subscribers hereto in any other railroad company, to any independent company not organized by said committee, or to any individual, for the purpose of retiring all the indebtedness incurred by said committee in the acquisition of the St. Louis & North Arkansas Railroad Company, and in the construction of the extensions herein provided for, "and if any surplus remains to distribute same to subscribers," or committee shall have power to make sale of property before re-organization. (1) Committee has power with consent of majority in interest of holders of beneficial certificates to secure extensions of such construction loan or to sell so much or the bonds and stock pledged as security therefor, to pay off said loans. (m) If said construction loans are paid either by a sale of the bonds and stocks pledged as security therefor or by sale of the entire property as before provided, the committee shall, after payment of expenses incurred in the performance of its duty, distribute any balance of moneys remaining in its hands ratably to the holders of certificates of beneficial interest. If the committee shall fail to make financial arrangements for the extensions of said road as contemplated within twelve months from the confirmation of the foreclosure sale, the Re-organization Agreement shall terminate and the holders of certificates of interest shall be entitled to a ratable distribution of the stock and bonds of the St. Louis & North Arkansas Railroad Company, as re-organized, less expenses incurred and paid out by the committee.

Fourth. Provides as to the duties and liabilities of St. Louis Union Trust Company, depositary.

Fifth. Sets out form of beneficial certificate and form of transfer thereof.

Sixth. Provides for other bondholders becoming parties to Re-organization Agreement by depositing their bonds on or before April 1, 1906.

Seventh. Provides for filling vacancies in the Committee of Re-organization.

Eighth. Provides for change of powers of the committee by a majority in interest of the subscribers thereto.

The document is signed by the consenting bondholders and by the Committee of Re-organization named therein.

Exhibit 2, attached to the petition, is the form of the notes and interest coupons of the Allegheny Improvement Company, subscribed for and purchased by the plaintiff, and is as follows:

"EXHIBIT 2.

"$1000

"UNITED STATES OF AMERICA.

"State of Missouri.

"Allegheny Improvement Company

Five Per Cent Collateral Trust Note.

"No. ......

"Know All Men by These Presents, That the undersigned, for value received, promises to pay to the bearer, at the office of the St. Louis Union Trust Company, in the City of St. Louis, Missouri, or if registered, to the registered holder thereof, on the first day of October, 1911, the sum of one thousand dollars ($1,000) with interest thereon from the first day of October, 1906, at the rate of five per cent per annum, payable semiannually, on the first days of April and October of each year; upon presentation and surrender of the annexed coupons as the same severally become due. This note is one of a series issued, or to be issued, for an aggregate amount not exceeding in par value the sum of six million dollars ($6,000,000) under and in pursuance of an agreement dated the 20th day of June, 1906, between John Scullin, D. R. Francis, Powell Clayton, R. C. Kerens and John F. Shepley, therein referred to as the Committee, and certain other persons, firms and corporations therein referred to as Subscribers, and of an Indenture of Pledge of even date herewith between the said Committee, as pledgors, and the St. Louis Union Trust Company, as trustee, whereby certain bonds and stock of the Missouri & North Arkansas Railroad Company, and certain other property, have been and are to be deposited with the said trustee as collateral security to the payment thereof. 'This note may be paid or redeemed at the option of the signers hereof, at any time before maturity, upon the date of maturity of any of the coupons hereunto attached after having previously given at least twenty days' notice thereof, by publication of the same in some daily newspaper, printed and

National Bank of Commerce v. Francis.

published in the said city of St. Louis, Missouri, signed by the trustee under said Instrument of Pledge. The holder of this note shall have the right to institute and prosecute against the signer hereof, whatever proceeding may be necessary in order to reach and apply to the payment hereof the securities held by it or by said committee, or the manager under the above-mentioned agreement of June 20, 1906, or deposited under said Instrument of Pledge as collateral security to the payment hereof, or to reach or apply as aforesaid any sum of money due said committee under said agreement of June 20th, 1906, from the subscribers thereto; provided, however, that no judgment or decree which may be rendered in such proceeding or otherwise upon this note or any agreement or covenant contained therein, shall be enforced against the signer hereof, or its stockholders, or against any member of said committee individually, or against his individual property.

"Dated at the said City of St. Louis, this, the 1st day of October, 1906.

"ALLEGHENY IMPROVEMENT COMPANY,
"By JOHN SCULLIN, President.
"(Form of Coupon)

"The Allegheny Improvement Company will pay to bearer at the office of the St. Louis Union Trust Company in the City of St. Louis, Missouri, twenty-five dollars on the first day of ...., being six months' interest due on its ...... collateral trust note No. ..,.........

"$25                                                                  $25
"CHARLES GILBERT, Secretary.
"(Form of Trustee's Certificate.)
"Trustee's Certificate.

"The undersigned Trustee, named in the within note, and the Indenture of Pledge therein referred to, hereby certifies that this note is one of the notes described in the within-mentioned Indenture of Pledge.

"ST. LOUIS UNION TRUST COMPANY, Trustee.
"By .................................................
Vice-President.

Exhibit 3 is the Subscription Agreement signed by the plaintiff bank and others agreeing to purchase the notes of the Allegheny Improvement Company, under the terms and conditions in such subscription Agreement recited. It is dated June 20, 1906. The members of the Re-organization Committee, naming them, are parties of

the first part, the St. Louis Union Trust Company, party of the second part, and the persons or corporations who may sign the same are parties of the third part. This subscription agreement recites that to procure subscriptions the committee make, as substantially accurate, the representations contained in the "following statement." The substance of said statement is that on the 15th of February, 1906, a Re-organization Agreement was made between the bondholders of the St. Louis & North Arkansas Railroad Company, representing $3,026,500 of its first mortgage bonds, which bonds were deposited with the St. Louis Union Trust Company as depositary, to be disposed of as might be directed by the committee named in said Re-organization Agreement, except Robert S. Brookings, who was succeeded by John F. Shepley as a member of said committee. That said committee purchased the property of said railroad company at the master's sale, foreclosing the mortgage, for $2,000,000, "and now holds said property as such committee with the powers and for the purposes expressed in said Re-organization Agreement." That the railroad so acquired extends from Seligman, Missouri, to Leslie, Arkansas, and has a length of 162.62 miles main line. That the committee has the power under said Re-organization Agreement and purposes to extend the line either by construction or through trackage arrangements, or both, northwesterly to Joplin, Missouri, and southeasterly to Memphis, Tennessee, or Helena, Arkansas. "For the purpose of raising the necessary funds for such extensions and for the betterment of the present railroad and for other ends necessarily or properly incident thereto, including the costs and expenses of said foreclosure suit, and of certain preliminary surveys and other work done, said committee is authorized by said Re-organization Agreement to borrow or cause to be borrowed through a construction company all the money necessary to said ends, and in order to secure the re-payment thereof to pledge all the stocks and all the bonds of the com-

pany owning the present St. Louis & North Arkansas
Railroad and the stocks and the bonds of the company
or companies owning the several extensions of said rail-
road, herein above-mentioned; provided the loans so
made shall be evidenced by collateral trust notes all pay-
able on the same date which shall be five years from the
date of the earliest of such issue, bearing interest, pay-
able in semiannual installments, at the rate of five per
cent per annum, and redeemable at the option of the
maker on the maturity of any semiannual interest coupon
upon due notice of such proposed redemption; and pro-
vided further that none of said notes shall be discounted
at more than five per cent of its face value; and provided
further that in addition to such discount a commission of
not exceeding two and one-half per cent upon the face of
the notes may be paid to the subscribers therefor or the
purchasers thereof.

"The subscribers to said Re-organization Agreement
reserve the primary right and privilege of subscribing
for or discounting said notes in an amount not exceeding
twice the par value of their several holdings of bonds
deposited under said agreement; and pursuant to said
privilege bonds of the aggregate par value of approxi-
mately $2,300,000 have been subscribed for by the said
depositing bondholders.

"And it is hereby agreed by and between the com-
mittee, the manager and the several subscribers as fol-
lows:

"The committee will organize or cause to be or-
ganized under the laws of the States of Missouri and
Arkansas, or one of them, a corporation or corporations,
in which will be duly vested the title to all the property
of the said St. Louis & North Arkansas Railroad Com-
pany acquired at the said foreclosure sale. If said rail-
road and its property shall be conveyed to more than
one company, the same shall be ultimately consolidated.
For the railroad and property aforesaid, the committee
shall receive all securities of the new or the consolidated

railroad company, which shall, in par value, be not less than twenty-five thousand dollars per mile in first-mortgage four per cent coupon bonds and not less than twenty-five thousand dollars per mile in stock, against every mile of present completed main line of said railroad.

"The committee agrees that all moneys received by it either from the subscribers hereto or from the other subscribers for said notes, shall be paid to the said manager, to be disbursed by it as hereinafter provided, and until so disbursed will be held by the latter as trustee, as additional security for the payment of the collateral trust notes next hereinafter mentioned.

"The committee will deliver, or cause to be delivered, to the subscribers, collateral trust five-per-cent notes, hereinabove described, or interim receipts of the manager therefor, upon the payment, as hereinafter provided, of his, her or its subscription—which said notes, in the aggregate, shall not exceed in par value the sum of six million dollars, and shall be issued and delivered as aforesaid at the rate of one thousand dollars in par value, for every nine hundred and fifty dollars paid in by such subscriber; and at the same time will cause to be returned to such subscriber in cash the sum of twenty-five dollars as a commission for the purchase of each of said notes. Said notes shall be made by the Allegheny Improvement Company, or some other construction company, shall be coupon notes, with interest payable semi-annually, and upon delivery will have the coupon next maturing thereafter show by a statement across its face a proper reduction in amount, if such shall be necessary, to represent the proper adjustment of interest at the date of such delivery. *All said notes shall be equally secured by an indenture of pledge, in substantially the form hereunto attached and made a part hereof,* under which there shall be deposited, and shall be held by the trustee therein named, first, all the stock and bonds which shall be issued either against the mileage of the present completed railroad, or against the mileage of railroad

to be constructed as herein provided, or against the expenditure of money for new construction or other purposes specified in this agreement, and, second, all unexpended moneys paid in by subscribers, as herein elsewhere provided.''

Then follow elaborate provisions for the sale of the collateral trust notes by the committee or its manager, the Union Trust Company, and the use of the money derived from the persons subscribing for said notes in re-imbursing the committee for expenses incurred under the Re-organization Agreement, and for the making of said extensions and equipment of the same, and of the present line of railroad, and for commissions and expenses authorized by the subscription agreement. Towards the close of the subscription agreement it is provided as follows: ''Nothing herein contained or otherwise shall constitute the subscribers partners, nor shall render any of them liable as under contract, or otherwise, except for this due proportion of the amount subscribed by him.'' The form of indenture referred to securing said collateral trust notes subscribed for, is part of Exhibit 3, and is made by said Re-organization Committee as pledgors, parties of the first part, and the St. Louis Union Trust Company as trustee, party of the second part. It recites the making of said subscription agreement, dated the 20th day of June, 1906, and that the pledgors assign and transfer to the trustee $3,065,500 of the first-mortgage bonds dated July 1, 1906, and the same amount of the capital stock of the Missouri & North Arkansas Railroad Company. Also all of the other first-mortgage bonds and all of the stock of said railroad or railroad which shall own its present line and the several extensions thereof, which may thereafter be issued and delivered to the committee or said St. Louis Union Trust Company under said agreement of June 20, 1906. Also all the moneys, so long as same shall remain unexpended, raised for the purposes provided in said subscription agreement of June 20, 1906.

"To Have and to Hold the property aforesaid unto the trustee and its legal successors and assigns forever:

"In Trust for the equal ratable benefit and security of all and every present and future holders and holder of any of the notes secured hereby, without any preference or priority of one note over another, for the uses and purposes herein expressed.

"1.   The pledgors may issue or cause to be issued from time to time, notes of the Allegheny Improvement Company, or some other construction company, *substantially in form contained in schedule hereto attached,* to an aggregate amount not exceeding in par value the sum of six million dollars.  Said notes shall be of even date herewith, shall bear interest at the rate of five per cent per annum, payable in equal semiannual installments, represented by coupons; shall be in denominations of one thousand dollars each; and shall contain a certificate of the trustee that such note is one of the notes herein referred to—without which certificate no note shall be entitled to the security afforded by this instrument."

Then follows provisions for payment of taxes by the trustee on the pledge property and other details not important to transcribe, and that:- "6.   In the event the said pledgors shall fail to pay or cause to be paid by the maker thereof, all of the notes issued or to be issued hereunder, together with the interest thereon, according the terms hereof or shall make default in respect of any other provision  herein contained, the trustee may and upon request in writing of the holders of at least one-half in par value of all the notes issued hereunder, and then outstanding, shall sell the said stocks and bonds pledged hereunder," at public auction at the front door of the court house in St. Louis, after due publication, and apply the proceeds to the payment of costs and then to the payment ratably of said notes and interest, and the remainder, if any, to the pledgors.  Attached to said indenture of pledge made part of said subscription agreement is a schedule setting out the form of notes to be

made by the Allegheny Improvement Company in the ·me words and figures as Exhibit 2, heretofore copied ιerein.

I. As to appellant's first contention, that defendants are liable as partners. We must rule this point against appellant. This contention is principally based upon the provision in the Re-organization agreement that "all profits made by such construction company shall, under proper contract to be made by the committee, be paid to the committee for the benefit of the holders of the certificates of interest."

Partnership.

But it is not sufficient to create a partnership *inter sese* that the parties were to share the profits of a given enterprise or transaction. They must also have *agreed,* that is, *intended* to share the losses and to become partners. This court, in Chapin v. Cherry, 243 Mo. l. c. 402, per WOODSON, J., said: "A partnership contract as defined by Cyc., in Vol. 30, page 349, and supported by all of the authorities is, 'A contract of two or more competent persons to place 'their money, effects, labor and skill, or some or all of them, in lawful commerce or business, and to divide the profits and bear the losses in certain proportions.' . . . ·Or, as was held in the case of Mackie v. Mott, 146 Mo. 230, the foundation of a co-partnership is one of intention by *all the parties thereto,* which must be arrived at from the contract itself, and surrounding circumstances. In Hazell v. Clark, 89 Mo. App. 78, l. c. 83, this language is used by the court: 'The terms of the contract, where there is one, must fix the real status of the parties toward each other. . . . The intention is to be ascertained from the whole of the contract—from the actual relations it creates—and not from the fact that the parties denominate it a partnership.' "

Mere participation in the profits, without an intention to become a partner and share losses, will not make parties partners as between themselves. [Hughes v.

Ewing, 162 Mo. 261.] In a late case in the Court of Appeals, Fuel Co. v. Brady, 202 Mo. App. l. c. 556, the rule is well stated as follows: "Persons cannot become partners, except by agreement, express or implied. The particular test as to the existence of the partnership relation, which is most widely accepted today, and which is applicable, especially as between the parties themselves, irrespective of the rights of third parties, is that a partnership is formed and exists only when it was the intention of the parties that they should be partners. Partnership contracts, like other contracts, are governed by the intention of the parties." Beauregard v. Case, 91 U. S. 134, much relied on by appellant's learned counsel, widely differs from the case we have before us. There the agreement provided that the parties should share the losses as well as the profits and expressly stated the parties were co-partners and that their agreement constituted a partnership.

We cannot find a single syllable in any of these documents contemplating that defendants shall be jointly or at all liable for any losses that any construction company might suffer, or that defendants intended to become partners in any respect whatever. But, on the other hand, elaborate provision was made to avoid all liability on the part of the defendants for all construction or extension work, by providing for a construction corporation to do such work and to issue its notes to raise money therefor and by clearly specifying, in the subscription agreement which plaintiff signed and in the notes it received, the precise character, form and terms of said notes whereby all liability for their payment was carefully limited to the securities pledged for the payment thereof, and the net earnings of the railroad, as reorganized and extended. and the unexpended funds derived from said notes. The recitals in the Bondholders Re-organization Agreement show that the only liability which the committee was authorized to fix upon the defendants, was for moneys necessary to be paid upon

296 Mo.—13

their bid at the master's sale and costs of the foreclosure, "*and to no greater extent,*" and then only "*severally in proportion*" to their holdings of bonds. The committee had no authority any where in any of the agreements pleaded, to fix any liability upon the defendants for constructing extensions or making other improvements, and said committee never undertook to do so. So that it is clear enough that defendants were not by their contracts to share or pay any losses growing out of construction work, and never intended to become partners and could not therefore have been partners as between themselves.

II. It is equally well established law that third parties cannot hold persons liable as partners, unless they are partners in fact and *inter sese,* except upon the ground of estoppel in cases where they have held them-

Estoppel. selves out as partners and the plaintiff has acted upon such holding out. There is no allegation in the petition and no provision in any of the documents upon which the petition is founded indicating that defendants held themselves out as partners to the plaintiff. "Except where the third party makes a case by reason of the alleged partner holding himself out as such, the question of partnership is the same as between the parties themselves." [Fuel Co. v. Brady, 202 Mo. App. l. c. 556, citing Distilling Co. v. Wilson, 172 Mo. App. 612; Nugent v. Armour Packing Co., 208 Mo. 480, l. c. 499.]

So that we must rule that the first count in the petition seeking to hold defendants as partners states no cause of action.

III. Again: That defendants were not intended to be liable as partners or at all, upon the Improvement Companys' notes subscribed for and purchased by plaintiff, and that plaintiff was aware of that

Subscription
Agreement. fact, and agreed thereto, is also clear from the recital in the subscription agreement,

which plaintiff signed, that the subscribers to the Re-organization Agreement had reserved the right of subscribing for said notes, and had subscribed for $2,300,000 thereof. It never was contemplated by the said agreement under which plaintiff purchased said notes, that any of the subscribers to the Re-organization Agreement, which the defendants were, should ever become payors of said notes, but that they should become *payees* thereof, the same as the plaintiff, to the extent of their subscription therefor.

IV.   There is no charge in the petition that defendants in any way fraudulently concealed from the plaintiff any interest, directly or indirectly, which they may have had in any of the railroad or construction companies, or in the profits, if any, of any such construction Notice: companies. On the other hand, the repeated Inquiry. references to the Re-organization Agreement, in the subscription agreement which plaintiff signed, was notice to plaintiff of such Re-organization Agreement, and put the plaintiff upon inquiry as to its contents, if it desired any fuller knowledge thereof than was recited in the subscription agreement itself. A purchaser, put upon inquiry, is to be charged with actual notice of all he would have learned had he inquired. [Lee v. Bowman, 55 Mo. 400; Fellows v. Wise, 55 Mo. 413.] So that plaintiff does not, in its petition, and cannot *successfully* in its argument here, charge that defendants resorted to any trick, artifice or concealment to induce plaintiff to purchase said notes, and that the "cards were not all on the table face up."

V.   But are the defendants liable to refund the moneys paid out by plaintiffs in the purchase of the Allegheny Improvement Company notes, because Ultra Vires. their purchase was *ultra vires* the plaintiff, as a national bank? We think not, and for the following reasons:

(a) The contract under which plaintiff paid out its money having been wholly executed and containing nothing immoral or prohibited by law, the money cannot be recovered back as having been paid out *ultra vires*, although, if it was *ultra vires*, the plaintiff could not have been sued upon its contract and required to pay the money thereon. This is the doctrine laid down by the authorities. [3 Michie on Banks & Banking, sec. 261, p. 2005 et seq; 14a. Corpus Juris, p. 319.]

In a very late case decided by this court, Schlitz Brewing Co. v. Missouri Poultry & Game Co., 287 Mo. 400, l. c. 407, opinion by J. T. BLAIR, J., we said: " "The defense of *ultra vires* is not admissible where the contract has been fully executed on one side, unless it is a contract expressly prohibited by law, ' " (Quoting RAUMBAUER, J., in Winscott v. Inv. Co., 63 Mo. App. 369). "The Missouri cases cited as supporting a contrary view involved questions concerning the enforcement of executory *ultra vires* agreements, and are thereby distinguished from the instant case."

In Attleborough Natl. Bank v. Rogers, 125 Mass. 339, the learned court held that a national bank which has purchased a promissory note and paid therefor cannot recover the money on the ground it had no authority to purchase the note. The court said at page 343: "The defendants had a right to dispose of the notes to whomsoever they chose, and if plaintiff bought them and paid for them it could not rescind the contract thus fully performed and executed, upon the ground that it was a purchase it had no authority to make, and recover back the money paid upon it. A corporation acting without authority is not in the position, with the privileges of an infant, to avoid an improvident contract, but in the position and subject to the liabilities and disabilities of a wrongdoer if it exceeds its authority. It cannot complete a bargain with a third party, which such third party has a right to make, and then rescind the contract, wholly executed, if such contract proves an improvident one, and recover back the consideration."

The Federal cases announce the same doctrine. [Railroad v. Railroad, 145 U. S. l. c. 407 et seq.; Alabama Coal Co. v. Trust Co., 197 Fed. 347; Thomas v. Railroad, 101 U. S. l. c. 85-6; Bank v. Matthews, 98 U. S. 621; Kerfoot v. Bank, 218 U. S. 281.]

The case of Rankin v. Emigh, 218 U. S. 27, cited by appellant, is not to the contrary, but holds that where a national bank receives property of an individual, under an *ultra vires* contract, it cannot keep the property and refuse to pay the value thereof.

The case of Bank v. Converse, 200 U. S. 425, so strongly relied on by appellant's learned counsel, was a suit against a national bank to enforce its liability as a subscriber (it subscribed to secure a debt due it) to the stock of a purely speculative corporation—i. e. one organized to deal in the stocks of other corporations—which subscription the court held was *ultra vires* the bank; but the court recognized that a national bank had authority to take the stock of other corporations as collateral to secure a present or past loan of money. That case was to enforce an *ultra vires* contract against the bank, and not a suit by the bank to recover money paid out by it under an *ultra vires* contract.

We hold that under the great weight of authority State and Federal, the plea of *ultra vires* cannot be used as a sword to recover back money paid under an executed *ultra vires* contract, although it may be used, under certain circumstances, as a shield to defend against the enforcement of such a contract.

(b)   But we do not consider the purchase or discount of the Allegheny Improvement Company notes as *ultra vires* the plaintiff National Bank. The National Bank Act, Sec. 9661, 9 U. S. Compiled Statutes 1916, (Rev. Stats. U. S. 5136), as to the powers of a national bank, provides: "Seventh. To exercise, by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and

negotiating promissory notes, drafts, bills of exchange and other evidences of debt; by receiving deposits; by buying and selling exchange; by loaning money on personal security; etc.''

Learned counsel for appellant contend that if we hold there was no absolute promise to repay the money procured from the plaintiff in and by the Allegheny Improvement Company notes, the alleged ''notes'' plaintiff purchased were not ''promissory notes'' or ''evidences of debt'' at all, and consequently plaintiff simply indulged in an illegal and *ultra vires* speculation, when it purchased said ''notes.'' We do not agree to this contention. We hold, it is true, that there was no absolute promise in said notes to re-pay the money, by the Allegheny Improvement Company, and the only recourse plaintiff had for such re-payment, was upon the stocks and bonds of the railroad companies and other funds pledged to secure them. While said notes may not have been, strictly speaking, in every sense ordinary promissory notes, they were ''evidences of debt,'' which the bank was allowed to discount. They were absolute promises to pay the money called for by them with interest out of the securities pledged to secure them, and their purchase or discount by plaintiff was not a mere speculative adventure, such as a direct purchase or subscription for stock in another corporation.

And we also hold the stocks and bonds upon which alone the plaintiff loaned its money to said Allegheny Improvement Company, was ''personal security,'' within the meaning of the National Bank Act, upon which plaintiff was expressly authorized to loan money. ''No express power to acquire the stock of another corporation is conferred upon a national bank, but it has been held that, as incidental to its power to loan money on *personal security,* a bank may, in the usual course of business, accept stock of another corporation as collateral, and by enforcement of its pledge it may become the owner of the collateral and be subject to liability as other

stockholders.'' [Bank v. Converse, 200 U. S. l. c. 438, quoting from Bank v. Kennedy, 167 U. S. 362.] In this case the plaintiff loaned or parted with its money exclusively, on the credit of the collateral and not the personal obligation of the maker of the notes it purchased. It had a lawful right to do so.

We hold therefore that there was nothing *ultra vires* the plaintiff bank in purchasing or discounting the said notes of the Allegheny Improvement Company, although said company made no absolute promise to pay said notes and the only security or means of payment provided for them was the sale of the stocks and bonds, the earnings, if any, of the railroad and other funds pledged for their payment in the indenture of pledge.

The demurrer was therefore properly sustained to the second count in plaintiff's petition as stating no cause of action.

VI. But it is said that the defendants are the principals of the Allegheny Improvement Company, and that said company was a mere dummy corporation, used as an agent of the defendants to acquire money for them to put into the construction of said extensions and improvement of the main line of railroad purchased by the defendants through the Re-organization Committee at the master's sale.

Dummy Corporation: Liability of Organizers.

Assuming, but not deciding, this to be true, still, the defendants would only be bound to comply with the obligations and liabilities imposed on such dummy corporation by the contracts or notes, under which the money was secured from the plaintiff. Defendants could be charged with no greater liability than the dummy corporation itself assumed, or than if defendants themselves had signed said contracts or notes, either as individuals or partners.

It is true the notes purchased by plaintiff in the first part thereof contained a promise on the part of the signer, the Allegheny Improvement Company, to pay

$1000 to the bearer on the first day of October, 1911, but this was qualified afterwards by language in said notes limiting the right of the holder to institute such proceedings only against the maker as were necessary to reach and apply the stocks and bonds pledged for the payment, of such notes. Said notes contained the following further express provision: "No judgment or decree which may be rendered in such proceeding, *or* otherwise, upon this note or any agreement or covenant contained therein shall be enforced against the signer hereof or its stockholders or against any member of said Committee individually, or against his individual property." The exact form, terms and conditions of said notes were also set out in the Subscription Agreement, signed by plaintiff when it agreed to purchase said notes. So that if defendants themselves, instead of their dummy corporation agent, had been the makers or signers of said notes, defendants could not be held liable in this action.

The cases where a principal, disclosed or undisclosed, has been held liable to pay money borrowed for him by virtue of a note made by a straw man or dummy promising to re-pay the money absolutely and without qualification, do not apply to this case, because in such cases the principal's obligation is co-extensive with and cannot extend beyond that of the straw man, and the principal is required to comply with the obligations imposed by the contract upon the straw man, but no more. In the case at bar, the dummy corporation's obligation did not extend to the unqualified or absolute payment of said notes, but only to the application of the collateral pledged therefor to such payment. The plaintiff never purchased the absolute obligation of said dummy corporation, an agent—and therefore not that of defendants— to repay the consideration the plaintiff paid for the notes it purchased or discounted. One of the principal purposes for which government is established amongst men is to maintain sacredness of contracts. Both the State and Federal Constitutions prohibit the passage of any

law authorizing the violation of contracts, and the courts are not authorized to do so by their judgments or decrees. In this case, the plaintiff received precisely what it agreed to purchase and did purchase and pay for, and it is entitled to no more, either in law or *ex aequo et bono.* Therefore it is not entitled to recover on its third count for money had and received. [Teasdale v. Stoller, 133 Mo. 645.] In view of our conclusion on the first ground of demurrer, it is not necessary to pass upon the question of the Statutes of Limitations raised by the second ground of demurrer.

The judgment of the court below should be, and is, affirmed. *Ragland, C.,* concurs; *Brown, C.,* not sitting.

PER CURIAM: The foregoing opinion by SMALL, C., is adopted as the opinion of Court in Banc. All concur, except *Elder, J.,* who dissents; *Woodson, C. J.,* not sitting.