TEXAS PLAINS BUILDING & LOAN ASS'N et al. v. COLONIAL COR-PORATION.

No. 5142.

Court of Civil Appeals of Texas. Amarillo.

Nov. 6, 1939.

Rehearing Denied Dec. 11, 1939.

Simpson, Dorenfield & Fullingim, of Amarillo, Gerald C. Mann, Atty. Gen., and Lloyd Armstrong, Geo. W. Barcus, and Judge Ocie Speer, Asst. Attys. Gen., for appellants.

Bryan, Stone, Wade & Agerton and B. G. Mansell, all of Fort Worth, for appellee.

STOKES, Justice.

The appellant, Texas Plains Building & Loan Association, was organized under the laws of Texas as a building and loan association in the year 1926. In 1930 it sold to appellee, Colonial Corporation, its "permanent" capital stock of the par value of $66,000 and from time to time issued other classes of its capital stock to investors and borrowers as provided by its charter and the law under which it operated. During the year 1929 the Association encountered financial difficulties which continued to grow worse and in 1934 it had a large number of borrowers who were unable to pay the notes and discharge real estate liens which it held upon property owned by them. In consequence of this condition the Association was forced to acquire by foreclosure and otherwise title to a large number of tracts or parcels of real estate consisting of town property located at Amarillo and neighboring towns and in the fall of that year its holdings of real estate amount-

ed approximately to $255,000 of its total assets of approximately $795,000. This condition precluded the Association from pursuing its normal operations and on November 16, 1934, the stockholders held a meeting at which it was decided to reorganize the Association by bringing about the incorporation of a new building and loan association with a capital stock equal to one-half of appellant's capital stock. The ultimate purpose of the reorganization and creation of the new corporation was to establish a building and loan association under a Texas charter which would possess assets of such nature as would be approved by the Federal authorities so that the new association could itself reorganize and take advantage of the benefits of the Federal statutes enacted by Congress for relief of building and loan associations whose assets, by reason of the general economic depression, had assumed stalemate proportions.

The new association that was organized as a result of the action of the stockholders of appellant took the name of Great Plains Building & Loan Association and appellant transferred to it approximately one-half of its assets, such half, however, consisting of notes, liens and securities that were in good standing and not delinquent, retaining those notes, liens and securities that were delinquent and retaining also the real estate which it had been forced to acquire. The capital stock of the Great Plains Building & Loan Association was issued to the stockholders of the Texas Plains Building & Loan Association in lieu of one-half of their stock in the latter concern and their holdings in the Texas Plains Building & Loan Association were thus reduced in amount to one-half of what they formerly had been. Soon after the organization of the Great Plains Building & Loan Association, it also was reorganized under the corporate name of First Federal Savings & Loan Association of Amarillo.

Appellant, Texas Plains Building & Loan Association, continued to encounter difficulty in collecting the amounts due and continually maturing upon its outstanding loans, and likewise it encountered great difficulty in disposing of its vast amount of real estate holdings. The State Banking Commissioner was dissatisfied with these conditions and insisted upon the sale and disposition of the various items of real estate so as to adjust appellant's assets in such manner as would be safe and in keeping with the general purpose of the law

under which it was operating. The record shows there was little or no market for real estate such as that owned by appellant and that it could be sold only if offered at prices materially below its book value as shown on appellant's books, which book value consisted of the amount of money appellant had invested in it.

· Under the law and its charter appellant was permitted to exchange its real estate for its capital stock, the real estate to bring not less than its book value and the capital stock to be acquired at not more than its withdrawal value. In an effort to extricate the Association from this pressing situation, Wm. Oliver, its president, acquiesced in by a majority, if not all, of its directors, evolved a plan by which the amount of purchase price offered by a prospective purchaser of an item of its real estate, which usually was considerably less than its book value, would be received by Oliver and deposited in a special account in a bank other than the one in which appellant kept its deposits, under the name of Wm. Oliver, trustee, the money to be used by him in the purchase from other stockholders of capital stock in appellant owned by them to an amount sufficient to equal the book value of the real estate being sold and then exchanging the real estate desired by the purchaser for the capital stock which had thus been acquired. The prospective purchasers being unwilling, however, to part with their money upon an indefinite and uncertain contingency, the plan finally devolved into one whereby the president of appellant would take the purchaser's money and immediately deliver to him a deed to the property being purchased by him, deposit the money in the trustee account, proceed then to acquire with it a sufficient amount of the capital stock of appellant from other stockholders to equal the book value of the item of real estate sold, and cancel the certificates of stock thus acquired. A form of written contract was prepared for Oliver's use in these negotiations and the first few of them were closed by the use of the written contract. Through carelessness or a lack of appreciation of the necessity of using the written form of contract, however, as the negotiations proceeded, these transactions became entirely oral, the purchaser paying to Wm. Oliver such an amount of money as he would agree to pay as consideration for the item of real estate being purchased by him and immediately receive from Oliver a deed to the property.

The money would then be deposited to the trustee account and in some instances it would be several weeks or months before a sufficient amount of the capital stock of appellant association could be acquired with the money paid by the purchaser to offset the book value of the property sold. The stock was acquired principally through brokers and at prices materially below its withdrawal value.

On the 20th of April, 1938, after an exhaustive examination and audit of the books and affairs of appellant Association, the Banking Commissioner addressed to the Association a lengthy communication in which he complained bitterly of the conduct of appellant's president and directors in disposing of its real estate and acquiring its stock in the manner described and requested the removal of Wm. Oliver as president and of all of its directors. He requested also "That those shareholders who were induced to sell their stock at figures far below its actual worth through the Wm. Oliver trustee account be allowed to recall their certificates of shares by returning to the association the amount paid to them through the Wm. Oliver trustee account." Other requests and orders were made but these constitute the principal ones which are involved in this litigation. In compliance with the requests and orders of the Commissioner, the president and all of the directors resigned except S. G. Dye and M. L. Dye who, by agreement, were retained as directors on account of the fact that they represented the Colonial Corporation which held the $66,000 of the permanent capital stock of appellant Association. Other directors consisting of H. E. Fuqua, P. L. Reppert and E. A. Simpson were elected. On November 4th and 5th, 1938, soon after this election, a meeting of the new board of directors was held at which a representative of the Banking Commissioner and his attorney were present. At this meeting, by vote of a majority of the directors, viz., Fuqua, Reppert and Simpson, a resolution was passed providing for the tender to those persons who had sold and delivered their capital stock to the former president, Wm. Oliver, and had received in payment therefor from the Wm. Oliver trustee account amounts below the withdrawal value of their stock so sold of an offer to reinstate their capital stock upon condition that they return to the association the amount received by them therefor from the Wm. Oliver trustee account. At this meeting a

resolution was also adopted providing that a liquidating dividend of 75% should be paid to the record investment shareholders, this dividend to include also those shareholders whose stock had been purchased through the Wm. Oliver trustee account and had been reinstated under the proposed plan.

After the meeting of the board of directors and the passage of the resolutions above mentioned a letter was prepared by the directors to be mailed to the stockholders who had parted with their capital stock and which had been purchased by the Association through the Wm. Oliver trustee account, inviting them to avail themselves of the opportunity contemplated by .the resolution, pay back to the association the amounts received by them from the Wm. Oliver trustee account and have their capital stock reinstated by the issuance to them of new certificates in the amount of the former capital stock which had thus been sold and acquired by the association.

Before the mailing of the letter to the former stockholders by the directors of appellant association, appellee Colonial Corporation filed this suit and obtained from the trial judge a temporary restraining order restraining the appellant, Texas Plains Building & Loan Association, P. L. Reppert, H. E. Fuqua and E. A. Simpson, as directors, and H. M. Beverley, as manager and secretary, from observing or enforcing the resolution adopted by them reinstating the former stockholders and from mailing, delivering, or transmitting to such stockholders the proposed letter or any other form of communication advising them of their supposed right to be reinstated.

The rights asserted by appellee, Colonial Corporation, in its petition were, substantially, that it was the owner of the $66,000 of permanent capital stock of appellant association which could not participate in the ordinary dividends of the association nor in any of its assets until all of the obligations, including the investment capital stock, had first been discharged and that, if the appellants were permitted to reinstate the stockholders who had parted with their capital stock through the Wm. Oliver trustee account, such reinstatement would increase the liabilities and obligations of the association and thus destroy the value of its permanent capital stock.

Appellants filed their answer on January 12, 1939, and, in addition to the general is-

sue, alleged, among other things, that from and after November 16, 1934, it had been the full intention of the stockholders of appellant association and of all of its directors that the association should be a liquidating concern; that since that date it had been in a process of voluntary liquidation and, therefore, it was subject absolutely to the orders and directions of the State Banking Commissioner. It alleged that the whole course of conduct involving the sale of its real estate and purchase of its own capital stock in the manner detailed was improper and unauthorized by law; that the capital stock purchased through the Oliver trustee account had been purchased at prices ranging from 18¢ to 85¢ on the dollar and the method used in purchasing it had therefore, created a preference in favor of certain stockholders and a discrimination against others. They alleged that these transactions amounted to purchases of its own stock by the Association with its own cash at prices below the withdrawal value and also amounted to a sale of its real estate at prices prohibited by law and constituted legal fraud upon those stockholders who had sold their capital stock. They set up the orders of the Banking Commissioner and alleged that they were, under the law, required to observe his orders, especially so in view of the fact that appellant association was in course of voluntary liquidation.

Appellants Texas Plains Building & Loan Association and the three directors made defendants in the suit impleaded Z. Gossett, the State Banking Commissioner, who answered by alleging, among other things, that appellee held the $66,000 of permanent stock of the association and was not entitled to receive any dividends thereon or any portion of the assets of the corporation until all of the expenses and the maximum dividends provided for other classes of stock had been paid. He adopted the pleadings of the association and its directors and prayed for judgment affirming and establishing the validity of the orders that had been issued by him to the directors of the association.

The case was tried before the court without the intervention of a jury upon the prayer for a perpetuation of the injunction. The trial resulted in the rendition of a judgment by the court in favor of the appellee, enjoining and restraining the appellants from recognizing, obeying and enforcing the order of the Banking

Commissioner to reinstate the former stockholders of the Association and from mailing, delivering or transmitting to the former stockholders the letter or notice from the directors inviting the former stockholders to repay the amount that had been paid to them for their capital stock and become reinstated as stockholders of the Association.

The Texas Plains Building & Loan Association, its three directors who were defendants in the suit, and the State Banking Commissioner, constituting all of the defendants, duly excepted to the judgment, gave notice of appeal, and the case is now before this court for review.

A number of assignments of error are presented by the various briefs but we think the controlling issues in the case may be disposed of by answering the following two questions: First, does the State Banking Commissioner possess, under the law, the authority to enforce by order to the directors the reinstatement of stockholders who have sold their capital stock which has been acquired by the association in the manner and under the circumstances detailed in the foregoing statement? Secondly, do the directors of the association, regardless of the order of the Banking Commissioner, have the right under the law to reinstate such former stockholders?

It has been said by the courts that all executive and administrative officers are enjoined and required to perform certain duties under certain circumstances and conditions and in the performance of these duties they frequently are put to the necessity of performing what the law terms quasi-judicial functions. Manifestly they could not perform these functions without first ascertaining the facts upon which their actions must be based. Shaw v. Lone Star Bldg. & Loan Ass'n, 123 Tex. 373, 71 S.W.2d 863. It has never been the purpose of the Legislature, however, to ensconce executive or ministerial officers into a situation wherein they would be permitted to usurp those functions delegated by the constitution to the judicial branch of the government. Texas Const. Art. 2, Sec. 1, Vernon's Ann.St.; Rochelle v. Lane, 105 Tex. 350, 148 S.W. 558. In performing their duties as quasi-judicial officers, they are confined to the authority conferred upon them by the law and are not permitted to pass beyond the realm in which exists their authority to function in this respect. The Banking Commission-

er of Texas draws his authority in matters such as are here involved from Art. 881a—13, Vernon's Annotated Civil Statutes. Eliminating those provisions not applicable to the questions here involved that act provides that "In case the Banking Commissioner of Texas shall find, upon examination or from other evidence, that any building and loan association is conducting its business, in whole or in part, contrary to law, * * * the Banking Commissioner of Texas shall, by an order in writing addressed to the president of such association, direct attention thereto and order compliance with the law * * *."

Upon such an examination, therefore, if the commissioner finds that a building and loan association is conducting its business in a manner contrary to law his right and duty are to issue an order to such association, directing its attention thereto and ordering it to comply with the law. Nowhere in the law governing such associations is the commissioner given authority to go behind the course of conduct which he finds the association to be pursuing at the time, assume the function of a court and enter a decree or order requiring the adjustment of rights that have accrued or become vested in those who have theretofore dealt with the association through its local officers. Undoubtedly, the commissioner had the right and authority to order a discontinuance of the course of dealing in which the officers of the association had been engaged. Such right and authority existed because the association was not authorized by the statute or otherwise to sell its real estate for less than its book value, nor to retire its capital stock at less than its withdrawal value unless, perhaps, such a course may become necessary in a process of liquidation. In this case, however, the order of the commissioner demanded not only that the president and directors be removed and the former course of dealing be discontinued, but that the association under the new management should go behind the transactions which had been consummated by the former directors, rescind the contracts under which the former stockholders had sold their stock, reinstate those stockholders on the books of the association, and place them in the same condition in which they were before they sold their stock. The record shows that those transactions were consummated by Oliver's dealings directly with the owners of the stock and also, on a number of occasions, through brokers.

The president of the association testified that he kept informed as to the market value of the capital stock and, when negotiations for the sale of a tract of real estate was begun, he fixed the price at not less than the approximate amount that would be necessary to purchase at the market price sufficient capital stock to off-set the book value of the real estate. If the transaction was closed, he would take the purchaser's money, deliver to him a deed to the property and deposit the money in a separate bank to his own credit as trustee. He would then take up negotiations with the stockholders who wished to dispose of their stock, assuming a kind of agency for the purchaser of the property, and, in some instances, with brokers who seemed to be in touch with such stockholders, and procure a sufficient amount of the stock to off-set, at its par value, the book value of the real estate sold. When the transactions were completed through brokers, the certificates of stock were endorsed by the owners in writing and assigned in blank or to the brokers and delivered to them. The brokers then would take the certificates to the president of the association and deliver them to him upon being paid the amount called for in the transaction, together with a small brokerage fee. To comply with the order of the commissioner it would have been necessary to ascertain whether or not these sales and assignments to the brokers by the stockholders were bona fide transactions, based upon valuable considerations paid by the broker and therefore completed as between the stockholder and the broker, or whether the assignments were merely made to the broker as a matter of convenience and a method by which the money would be received by the broker from the president of the association and thereafter delivered by him to the stockholder who was selling his stock. The order made no provision for these investigations but, whether it did or not, they necessarily would have been the exercise of judicial functions and encompassed the duty of ascertaining the validity of each transaction, including questions of fraud, misrepresentation, agency and other legal questions that may arise, and applying the law in such manner as to determine who would be entitled to the consideration that had been paid for the capital stock. These necessarily were judicial functions and extended far beyond the realm of judicial ascertainment conferred upon the banking commissioner by the statute which limited his powers to those only of a quasi-judicial officer. The provision of the statute which gives to the commissioner authority to direct the attention of the association's officers to the unlawful manner in which its affairs are being conducted and order compliance with the law extends no further than to enable him to put a stop to the irregular conduct and require that the affairs of the association thereafter be conducted in accordance with the law. Any rights or obligations that may have arisen between the acting parties to these transactions or any advantages or disadvantages that may have accrued to them by virtue thereof constituted bases upon which suits could be filed and essentially were matters that could be adjusted only by the orderly processes of investigation and adjudication observed by the courts which constitute the judicial branch of the government.

▮ Appellants seek to justify the order of the commissioner and the inclination of the directors of the association to comply with it by the contention that the Texas Plains Building & Loan Association was at the time in a process of voluntary liquidation. We cannot accede to this contention. Art. 881a—55, Vernon's Ann. Civ.St., directs the manner in which such associations may enter upon a process of voluntary liquidation. It provides that such process shall be instituted by vote of the shareholders owning two-thirds of the voting shares. Further provision is made that before such resolution shall take effect, a copy thereof, certified to by the president and secretary of the association, together with an itemized statement of its assets and liabilities, sworn to by a majority of its board of directors, shall be filed with the Banking Commissioner. It provides furthermore that when the Banking Commissioner has approved such resolution it shall thereafter be unlawful for the association to issue stock or make loans and that all of its income and receipts in excess of actual expenses of management shall be applied to the discharge of its liabilities. Further provision is made by the statute to the effect that the plan of liquidation, including contemplated expenses and sale of any or all of its assets, shall have the approval of the banking commissioner or his authorized representative before any expenses are incurred or any sales are made. As far as is shown by the record before us no such vote had been taken

among the shareholders nor had two-thirds of the voting shares enacted any resolution of the nature required by the statute. In fact the record does not show that any step required by the statute had been taken by the shareholders or officers of the association looking to its liquidation. It is indicated by the record that some of the directors and officers entertained the assumption that the association was in a process of voluntary liquidation. No new loans were made during the period between the reorganization and the issuing of the order by the commissioner to reinstate the former stockholders and these conditions are presented by appellants as evidence of the fact that the association was, as a matter of fact, in a process of voluntary liquidation. While these conditions probably would have existed if the association had complied with the law and entered into a process of voluntary liquidation, it does not follow that because of them the association necessarily was in such a process. Its failure to make new loans is readily accounted for by its financial condition. It was already overburdened with a large number of tracts of real estate which the commissioner was continually insisting should be sold and these conditions probably warranted the assumption that the association inevitably was drifting into liquidation, but no steps provided by the law for such a course had been taken and we cannot agree with appellants that by virtue of the conditions shown, in the absence of the processes provided by the statute, the association was in a state of voluntary liquidation to the extent that the Banking Commissioner acquired over it authority greater than that which he held under normal conditions.

The most that can be said of the transactions conducted by the directors, whereby the capital stock of the association was purchased for a consideration below its withdrawal value in derogation of the provisions of the statute and its charter, is that they were ultra vires. It cannot be said they were illegal. They involve nothing more than irregular transactions by which the stock was procured in a manner not authorized by law. Moreover, they were in all respects completed and closed transactions. The title to the certificates of capital stock passed in each completed sale and the consideration therefor had been paid. They were, therefore, executed and not executory transactions. There

is no provision in the charter of the association which prohibits the purchase by it of its corporate stock and no such prohibition is found in the statutes. Under such conditions, by the great weight of authority in this and other jurisdictions, such transactions constitute merely ultra vires acts. There is nothing in the record to indicate they were not made in good faith nor does the record contain a suggestion that either the president or the directors of the association were actuated by any evil or impure motives. Upon the completion of the purchases of the capital stock, the stock became the property of the association and fixed the rights of those holding interests in it. San Antonio Hardware Co. v. Sanger, Tex.Civ.App., 151 S.W. 1104; Hesse Envelope Co. v. Addison, Tex. Civ.App., 166 S.W. 898; Koch v. Val Verde Merc. Corp., Tex.Civ.App., 4 S.W. 2d 662; Howe Grain & M. Co. v. Jones, 21 Tex.Civ.App. 198, 51 S.W. 24; Alabama Consol. Coal Co. v. Baltimore Trust Co., D.C., 197 F. 347.

In the Sanger case, supra, the Court of Civil Appeals of the Fourth District, speaking through Justice Fly, said [151 S.W. 1105]: "There is no provision in the charter prohibiting the purchase of its stock by the corporation, nor is such action prohibited by the statutes of Texas, and in the absence of such provisions in charter or statute the general rule, as applied to corporations by the weight of authority, seems to be that a solvent corporation has the authority to purchase its own stock, where the purchase is made in good faith."

A writ of error applied for in that case was denied by the Supreme Court. The question is thoroughly discussed and the court fortifies the holding by the citation of a large number of decisions from this and other jurisdictions. The rule announced, the essence of which we have quoted, is, we think, well established and under it there can be no question, it seems to us, that upon the completion of the sales transactions the Texas Plains Building & Loan Association became the owner of the capital stock which it purchased. The rights of appellee, Colonial Corporation, as owner of the permanent capital stock, therefore, became fixed and vested and it had the right to complain as it did in its petition in this case. Under the law and the charter of the association, the stock classed as "permanent" capital stock was permitted to participate in the assets of the

association only after all of its other obligations had been discharged, including the value of, and dividends upon, its other capital stock. It is not difficult to see, therefore, that if the capital stock that had been purchased by the association of the par value of approximately $156,000 for an aggregate consideration of about one-third of that amount were reissued and the original stockholders reinstated, the liabilities of the association would have been materially increased and perhaps to the extent, as alleged by appellee, that it would have destroyed the permanent capital stock held by it. Unless, therefore, the purchases of the investment stock in the manner in which it was purchased was illegal and void and of such nature that the title to such stock did not pass to the association, the association became the owner thereof although it had been acquired in an irregular manner and under circumstances which are held to constitute ultra vires.

From what we have said it follows that in our opinion the Banking Commissioner does not have the authority to enforce by order to the directors of such an association the reinstatement of stockholders who have sold their capital stock to it in the manner and under the circumstances shown by the record in this case. The judgment entered by the trial court enjoined the appellant association and its directors and officers from in any manner recognizing, observing or enforcing that portion of the resolution adopted by them in their effort to comply with the order of the Banking Commissioner and which undertakes to restore the former shareholders of the association to their original status as such. In our opinion, the judgment was warranted by the facts and was in keeping with the law governing the matters involved. Appellant's assignments of error in respect thereto are, therefore, overruled.

The remaining question which presents itself from the record and the discussions in the briefs, and which we deem pertinent, relates to the authority of the directors of the association to reinstate the former stockholders, independent of any order that may have been entered or delivered to them by the Banking Commissioners. Slaughter Cattle Co. v. Potter County, Tex.Civ.App., 235 S.W. 295; Potter County v. Slaughter Cattle Co., Tex. Com.App., 254 S.W. 775. Obviously, if they possessed that authority, the judgment would be wrong whether the commissioner had the authority to issue and enforce the order or not. As we have shown, the consideration for the capital stock that was purchased by the association had been paid. The certificates of stock had been endorsed by their former owners and delivered to the association. The transactions were, therefore, executed on both sides and were completed and closed transactions. Even though they constituted ultra vires acts they are recognized as unassailable and are permitted to stand as the foundation of rights acquired under them. This being true the capital stock thereafter belonged to the association and constituted a portion of its assets. The "permanent" capital stock owned by appellee was thereby enhanced in value. If the directors had the right to redeliver it to those who formerly owned it, and reinstate them as investment stockholders in the association, such right would be an arbitrary one and empower the directors arbitrarily to enhance, reduce in value, or completely destroy the value of the permanent stock held by appellee without reference to its interests or its rights. In our opinion the directors possessed no such authority. It may be that the directors entertained the altruistic thought that the former stockholders had been imposed upon; that they had been induced to part with their stock at a price far below what it was, or ultimately would have been, worth and that a legal fraud had thus been perpetrated upon them. Indeed, they make such contention here. Their purpose seems to have been to correct the supposed wrongs and injuries that had been imposed upon the former stockholders and undo that which the directors felt had wrongfully been done. While such a course may contain the elements of conscientious and equitable principles, yet the moral maxim that "one should be just before being generous" still prevails. Regardless of any commendable sentiments of restitution that may have actuated the directors in their efforts to correct what they conceived to be an injury, the transactions involved had resulted in placing in the association the title and possession of the capital stock purchased and paid for by it. The rights of appellee as the owner of its permanent capital stock immediately accrued and the directors were without authority to deprive it of those rights without its consent. To return the capital stock and reinstate the former shareholders would have resulted in the

material reduction, if not the complete destruction, of the value of the permanent capital stock held by appellee. This the directors had no right to do.

We have considered all of the assignments of error presented by the briefs of appellants and, in our opinion, none of them reveals error. The judgment will, therefore, be affirmed.