## TEXAS PLAINS BUILDING & LOAN ASSOCIATION ET AL. V. COLONIAL CORPORATION.

No. 7692. Decided April 30, 1941.
Rehearing Overruled May 28, 1941.
(151 S. W., 2d Series, 193.)

*Simpson, Dorenfield & Fullingim* and *E. A. Simpson,* all of Amarillo, for plaintiff in error. Texas Plains Building & Loan Association, and *Gerald C. Mann,* Attorney General, *Geo. W. Barcus, Lloyd Armstrong, Ocie Spear,* Assistants Attorney General, and *Joe T. Goodwin,* of Austin, for plaintiff in error Banking Commissioner.

The statute alone defines the exclusive method by which a corporation may acquire its share of stock through withdrawals, etc., and the statute does not include the method used by the association and its president in this instance, and it was error for the court to hold that the association had the legal right to purchase and acquire its outstanding unpledged shares in the way it did. Republic Bldg. & Loan Assn. v. Lufkin, 124 Texas 77, 124 S. W. (2d) 979; Bicocchi v. Casey-Swasey Co., 91 Texas 259, 42 S. W. 963.

*Bryan, Stone, Wade & Agerton* and *B. G. Mansell,* all of Fort Worth, for defendant in error.

MR. JUDGE HICKMAN delivered the opinion of the Commission of Appeals, Section A.

The defendant in error, Colonial Corporation, owns substantially all of the permanent stock of the planitiff in error, Texas Plains Building and Loan Association, of the par value of $66,000.00. In 1934 the Association itself unable to pay dividends or meet the withdrawal demands of its shareholders. Because of a nationwide depression, aggravated by a disastrous and long continued drought in the Panhandle of Texas, it had been forced to repossess and then owned much real estate. To meet that situation the stockholders decided to reorganize and effected such reorganization by procuring a charter for a new building and loan association with a capital stock equal to one-half of that of the old association. Fifty per cent. of the par value of the investment stock of the stockholders in the old association was reissued to them in the form of stock in the

new association, and the remaining fifty per cent. thereof was retained by them as stock in the old association. The new association immediately federalized and became the First Federal Savings and Loan Association of Amarillo. In the formation of the new association there was transferred to it approximately one-half of the assets of the old association. The assets so transferred, however, were securities which were not delinquent, together with a substantial amount of cash. The assets retained by the old corporation, except some cash, were delinquent notes, liens and securities and real estate which the association had been compelled to acquire, all of uncertain market value. After the creation of the new association the old association issued no more stock and made no more loans, but it did not go into voluntary liquidation as provided by statute, Article 881a-55, Vernon's Civil Statutes. Neither was its charter forfeited nor was suit instituted against it for the purpose of winding up its affairs as provided in Article 881a-13. Thereafter its efforts were devoted exclusively to winding up its affairs, although it did not occupy the status of being in statutory liquidation, either voluntary or involuntarily.

The plan followed by the old association for the sale of its real estate was substantially as follows: An account was opened in the name of William Oliver, Trustee. When a purchaser for a tract of real estate was procured and the price agreed upon, which price was usually far below its book value, such amount would be received by Oliver and deposited in his account as trustee. Thereafter, checks were drawn upon this account for the purchase of shares of stock at prices much below their withdrawal value. Much of the stock was acquired through brokers. The certificates would be endorsed by the owners to the brokers and by them surrendered to the association.

In 1938, the then banking commissioner addressed a communication to the Association condemning the conduct of its officers and directors in disposing of its real estate and acquiring its stock in the manner above indicated and requested the removal of William Oliver as President and all of the directors of the Association. He further directed or requested that those shareholders who had parted with their stock at prices below its actual worth, through the trustee account, be allowed to recall their certificates of shares by returning to the Association the amount received by them from such account. Thereafter, in compliance with the orders of the Commissioner the president and all of the directors but two resigned, the two being retained by agreement as representatives of defendant in error, Colonial

Corporation, the owner of the permanent stock. The new directors elected at that time were H. E. Fuqua, P. L. Reppart and A. E. Simpson. Thereafter, at a meeting of the new board, attended by a representative of the Banking Commissioner and his attorney, a resolution was adopted by a majority vote, the directors voting in favor of such resolution being the newly elected directors above named. It was provided in the resolution that a liquidating dividend of seventy-five per cent. be paid to the investment stockholders of record on the books of the Association; that a like dividend be declared and set up in favor of the shareholders who would avail themselves of the right to become reinstated by returning the amount which they had received from the William Oliver Trustee account in payment of their shares; and that such former shareholder be advised of the action of the board and be invited to accept the privilege of being reinstated.

This suit was brought by the Colonial Corporation, owner of the permanent stock of the Association, against the Association, its three directors above named, and H. M. Beverly, in his official capacity as manager and secretary, to enjoin them and each of them, their attorneys, agents and employees from "recognizing, observing or enforcing, or from attempting to recognize, observe or enforce that portion of the resloution adopted by the Board of Directors of defendant Association by which defendant Association undertook to recognize any supposed rights of and to reinstate any former stockholders of said defendant Association to their former status as such, and from mailing, delivering, transmitting or in any manner communicating to such former stockholders of defendant Association, or any of them, the proposed letter or any other form of communication to the same effect, advising such former stockholders of their supposed right to be reinstated as such stockholders and to receive and enjoy the dividends and other privileges to that status appertaining; * * *."

The defendants impleaded the Banking Commissioner, who answered electing to make himself a party defendant. He also filed a counterclaim or cross action against the plaintiff, praying for affirmative relief to the extent that it be adjudged that his orders issued to the Association above mentioned were valid, and that the plaintiffs be perpetually enjoined from interferring or attempting to interfere with his orders and the resolutions of the Association in compliance therewith in respect to the matters in controversy.

Upon final hearing the relief sought by the Commissioner

was in all things denied, and that sought by the Colonial Corporation was granted. In effect, the Association and its directors and officers were perpetually enjoined as prayed for in the language above quoted. All of the defendants, including the Banking Commissioner, appealed and the Court of Civil Appeals affirmed the judgment of the trial court. 135 S. W. (2d) 153. Two applications for writs of error were filed, one by the Banking Commissioner and the other by the Association and its three directors and Secretary-Treasurer, above named.

Articles 881a-26, Vernon's Civil Statutes, contains this provision:

"* * * that any association in partial or full payment and settlement of the price and consideration of any sales made of real estate belonging to it, and acquired by foreclosure or otherwise, may accept the unpledged shares of said association at a value not greater than the withdrawal value of such shares; and provided further, that the sale price of such real estate shall not be less than the book value thereof; * * *."

The defendant in error relies upon that provision as statutory authority for the method pursued by the old directors in disposing of the real estate of the Association and retiring a portion of its capital stock. We are not in agreement with its construction of the provision. It applies only to the manner of payment for real estate and not to the method for purchasing stock. It is disclosed by the record that approximately $51,000 of the real estate of the Association was sold for cash at a price less than the book value thereof, and that with the proceeds of such sale approximately $156,000 of the investment stock was purchased, cancelled and retired at prices varying from 18c to 85c on the dollar. The cash derived from sales was kept in a separate trust fund and the stock was purchased with that fund. The facts conclusively establish that the sale of the real estate and the purchase of stock were separate and distinct transactions. Deeds would be executed and delivered to the purchasers of real estate at the times the transactions were concluded. Days, weeks or months thereafter stock would be purchased. The sales were made for whatever amount was agreed upon and the question of how much stock could be retired with the proceeds of the sale was one to be determined later by the price which was paid for the stock. The question of the legality of such sales of real estate is not presented in the instant case. No attempt is being made to set aside such sales.

Our conclusion that the statutory provision above quoted did not authorize the association to acquire the stock in the manner above detailed, does not lead to the holding that such stock was acquired in an unlawful manner. While the particular provision of the statute was not followed in acquiring this stock, it cannot be held in this proceeding that its acquisition was illegal. It appears that most of this stock was transferred by the owners to third persons, referred to in the record as brokers. These brokers negotiated with the Association and surrendered the stock certificates at prices in excess of those paid to the owners. There is no proof in the record that either the Association or these brokers practiced any character of fraud upon the owners of the stock. So far as is disclosed by this record such transactions were negotiated by men dealing at arms length without any taint of fraud or overreaching. We assume that the owners of this stock concluded that it would be to their financial interests to sell their stock at a discount rather than to place the Association into voluntary liquidation. No reason is perceived why such contracts are not valid.

Further, there is no provision of our statutes which forbids a building and loan association from purchasing and retiring the stock of its members at a price less than its withdrawal value. The statutory provision above quoted permits the Association to accept unpledged shares at a value not greater than their withdrawal value in payment of real estate. It puts a maximum price at which the Association may accept its stock, but no minimum. By the express provisions of Article 881a-37, sec. 1, subdivision (d), associations are authorized to make loans upon the sole security of pledged shares. In fact, one of their distinctive methods of operation is that of dealing in their own stock. One of the elements of our statutory definition of such an association is that it "accumulates the funds thus loaned through the issuance or sale of its own shares." Art. 881a-1, Vernon's Civil Statutes. Shareholders have withdrawal rights and the Association has the power to forfeit or cancel stock. In 12 C. J. S., Building and Loan Associations, sec. 37, p. 445, it is stated: "A settlement with a withdrawing member cannot be set aside except for fraud or bad faith, and not then, where the settlement was made openly with full opportunity for knowledge on both sides." In Tex. Jur., p. 708, sec. 3, it is stated: "When he (the shareholder) deals with the corporation he does so as if he were dealing with another individual, or with a body in which he holds no membership."

To recognize the authority of the Banking Commisisoner or

of the majority of the Board of Directors under his orders to reinstate all of the former stockholders of this Association would be to uphold their authority to cancel various and sundry contracts between the former stockholders and different brokers, none of which are parties to this suit and that without any showing of fraud in their execution. No such authority has been delegated to them.

Much space is devoted in the briefs to a discussion of the powers of the Banking Commisisoner to adjust conditions brought about by the wrongful acts of the Association. That question is not reached until it is first determined that the Association has acted unlawfully. We are not here called upon to define the powers of the Banking Commissioner to undo wrongs. What we hold is that it has not been established that a legal wrong has been done by the Association. From that holding it follows, of course, that neither the Banking Commissioner nor the Board of Directors acting under his instructions is authorized to cancel the contracts in question and reinstate the shares of stock as proposed by the resolution under attack.

There is also much space given in the briefs to an able discussion of the powers of the Commission when an Association is in liquidation. We have not considered that question for the reason that this Association is not in liquidation. The statutes provide the exclusive method for liquidating an association. Connally v. Continental Southland Savings and Loan Association 121 Texas 565, 51 S. W. (2d) 293; 9 Am. Jur., Building and Loan Associations, Sec. 84.

The judgment of the Court of Civil Appeals is affirmed.

Opinion adopted by the Supreme Court April 30, 1941.

Rehearing overruled May 28, 1941.